RUBIE ROGERS & others[1] vs. COMMISSIONER OF THE
DEPARTMENT OF MENTAL HEALTH & others.[2]

Suffolk. March 10, 1983. — November 29, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Incompetent Person*, Consent to medical treatment, Right to refuse med-
ical treatment. *Mental Health. Guardian*, Incompetent person, Con-
sent to medical treatment.

A patient's involuntary commitment to a mental institution is not, in it-
self, a determination that the patient is not competent to make deci-
sions concerning his treatment. [494-497]
A distinct judicial determination of an institutionalized mental patient's
incapacity to make decisions concerning his treatment must precede
any determination to override the patient's right to make these deci-
sions. [497-498]
With respect to an institutionalized mental patient who has been adjudi-
cated incompetent to make decisions concerning his treatment, a sub-
stituted-judgment decision establishing a treatment plan must be made
by a judge, after a hearing, and not by medical personnel, although
the patient's progress under a substituted-judgment treatment plan
may be monitored by a court-appointed guardian. [499-504]
Discussion of the factors to be considered by a judge in making a substi-
tuted-judgment decision establishing a treatment plan for an incompe-
tent patient who has been committed to a mental institution. [505-507]
The State's police power permits medical personnel of a mental institution,
acting without prior court approval, to treat a nonconsenting mental
patient with antipsychotic drugs only if the patient poses an imminent
threat to himself or others, and only if no less intrusive method of
treatment is available. [507-511]
The State as parens patriae may sanction the involuntary administration,
without prior court approval, of antipsychotic medication to an in-

---

[1] Rubie Rogers is one of seven named plaintiffs representing a class com-
posed of all present and future voluntary and involuntary patients at the
May and Austin Units of the Boston State Hospital who have been secluded
or medicated without their consent.

[2] The other defendants are various hospital physicians and administra-
tive staff members responsible for the plaintiffs' care.

competent or apparently incompetent patient in a mental institution only where the doctors treating him determine that the medication is necessary to avoid an immediate, substantial, and irreversible deterioration of a serious mental illness. [511-512]

QUESTIONS OF LAW certified to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.

*Leah S. Crothers,* Special Assistant Attorney General, for the defendants.

*Richard Cole (Robert Burdick* with him) for the plaintiffs.

The following submitted briefs:

*Donald N. Bershoff, Geoffrey P. Miller & Paul R. Friedman,* of the District of Columbia, for American Psychological Association, amicus curiae.

*Joel I. Klein,* of the District of Columbia, for American Psychiatric Association & another, amici curiae.

*Robert H. Weber, Jonathan Brant, Cynthia Carr & Richard Castelnuovo,* for Mental Health Legal Advisors Committee, amicus curiae.

*Robert M. Levy,* of New York, & *John Reinstein,* for American Orthopsychiatric Association & others, amici curiae.

*Joseph H. Rodriguez, Laura M. LeWinn & J. Benedict Centifanti,* of New Jersey, for New Jersey Department of the Public Advocate, Division of Mental Health Advocacy, amicus curiae.

ABRAMS, J. We are asked to respond to nine questions certified by the United States Court of Appeals for the First Circuit which focus on the right of involuntarily committed mental patients to refuse treatment, and the standards and procedures which must be followed to treat those patients with antipsychotic medication.[3] The basic conclusions we

---

[3] "Antipsychotic" drugs are "medications such as Thorazine, Mellaril, Prolixin, and Haldol that are used in treating psychoses, particularly schizophrenia." *Rogers* v. *Okin,* 634 F.2d 650, 653 n.1 (1st Cir. 1980), vacated and remanded sub nom. *Mills* v. *Rogers,* 457 U.S. 291 (1982). Be-

reach are that a committed mental patient is competent and has the right to make treatment decisions until the patient is adjudicated incompetent by a judge. If a patient is adjudicated incompetent, a judge, using a substituted-judgment standard, shall decide whether the patient would have consented to the administration of antipsychotic drugs. *Guardianship of Roe,* 383 Mass. 415, 443-448 (1981). *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 750-755 (1977). No State interest justifies the use of antipsychotic drugs in a nonemergency situation without the patient's consent. Antipsychotic drugs, which are used to prevent violence to third persons, to prevent suicide, or to preserve security, are being used as chemical restraints and must follow the strictures of G. L. c. 123, § 21, and the regulations promulgated pursuant to the statute. A patient may be treated with antipsychotic drugs against his will and without prior court approval to prevent the "immediate, substantial, and irreversible deterioration of a serious mental illness." If a patient is medicated in order to avoid "immediate, substantial, and irreversible deterioration of a serious mental illness," and the doctors expect to continue to treat the patient with antipsychotic medication over the patient's objection, the doctors[4] must seek adjudication of incompetency, and, if the patient is adjudicated incompetent, the court must formulate a substituted-judgment treatment plan.

We summarize the facts and procedural background of the case.[5] On April 27, 1975, a class action was commenced

cause the parties focus on antipsychotic drugs, our answers concerning medication are limited to antipsychotic drugs.

We appreciate the helpful analysis of the issues in amicus curiae briefs by: the American Orthopsychiatric Association, the Mental Health Association, and the Civil Liberties Union of Massachusetts; the American Psychiatric Association, and the Massachusetts Psychiatric Society; the American Psychological Association; the Mental Health Legal Advisors Committee; and the New Jersey Department of the Public Advocate, Division of Mental Health Advocacy.

[4] Our references to doctors include nurses, mental health professionals, staff, social service agencies, and hospitals.

[5] Additional facts will be presented as required in our discussion of the issues. At oral argument, the parties agreed that we may derive the facts

in the United States District Court for the District of Massachusetts against the defendant Commissioner of the Department of Mental Health (department) and numerous doctors and administrative staff members of the May and Austin Units of Boston State Hospital (hospital), pursuant to 42 U.S.C. § 1983 (1970). The seven named plaintiffs, all of whom had been committed to the hospital prior to commencement of the action, challenged the defendants' practices of secluding and medicating patients against their will. Alleging that these practices infringed their rights under the United States Constitution and violated acceptable medical standards, the plaintiffs sought injunctive relief for the class and an award of damages for themselves in the Federal District Court.

Three days after the complaint was filed, a Federal District Court judge issued a temporary restraining order, prohibiting the seclusion and antipsychotic medication of hospital patients in nonemergency situations without the consent of the patient or a guardian. After trial, the judge denied damages because the defendants' medication and seclusion practices were in accordance with acceptable medical standards. *Rogers* v. *Okin*, 478 F. Supp. 1342, 1380-1389 (D. Mass. 1979) (hereinafter cited as *Rogers I*).

However, the judge determined that mental patients not adjudicated incompetent have a constitutional right to refuse treatment in nonemergency situations, and that the same right extends to incompetent patients, for whom the treatment decision should be made by a guardian using a substituted judgment standard. *Id.* at 1361-1368. The judge therefore enjoined the defendants from forcibly medicating patients except in an "emergency," which the judge defined as "circumstances in which a failure to [medicate

primarily from those found by the United States District Court in *Rogers* v. *Okin*, 478 F. Supp. 1342 (D. Mass. 1979), as modified by the United States Court of Appeals in *Rogers* v. *Okin*, 634 F.2d 650 (1st Cir. 1980), vacated and remanded sub nom. *Mills* v. *Rogers*, 457 U.S. 291 (1982).

forcibly] would bring about a substantial likelihood of physical harm to the patient or others." *Id.* at 1371.[6]

The defendants appealed the decision enjoining forcible medication of patients absent an emergency. The plaintiffs cross appealed from the denial of their claims for damages. The Court of Appeals affirmed the denial of the damage claims, but vacated and remanded the issue of injunctive relief in light of its opinion. *Rogers* v. *Okin,* 634 F.2d 650 (1st Cir. 1980) (hereinafter cited as *Rogers II*).

In its opinion, the court concluded that the mentally ill have a constitutionally protected right to decide whether to be treated with antipsychotic drugs, *id.* at 653, and that involuntarily committed patients are presumed to be competent to assert that right in their own behalf, *id.* at 658-659. However, that court modified the trial judge's decision in two respects. First, it determined that the "substantial likelihood of physical harm" standard, application of which the judge required prior to forcible administration of antipsychotic medication, is too narrow, and that the hospital physicians could use their discretion in deciding to administer drugs forcibly, after balancing the interests of the patients against the State's police power interest in preventing violence within the institution. The court remanded for the District Court to design procedures to ensure that patient interests would be adequately protected. *Id.* at 656-657. Second, the Court of Appeals concluded that the judge's definition of an "emergency" in which a patient could be treated against his will was too limited. The Court of Appeals expanded the meaning of emergencies to include those situations in which an incompetent patient's health would significantly deteriorate without medication. *Id.* at 659-660. The case was remanded on this issue for the judge's consideration of expeditious methods for determining incompetence when delay would be harmful. *Id.* Furthermore, the court held that the Commonwealth need not seek

---

[6] The judge also granted injunctive relief on the plaintiffs' seclusion claims. The decision on seclusion was not appealed, and no question relating to seclusion was certified to us.

individualized guardian approval for decisions to treat patients with antipsychotic drugs. *Id.* at 661.

The United States Supreme Court granted the defendants' petition for a writ of certiorari, in which they sought review of the Court of Appeals' decision on the issue of forcible medication of involuntarily committed patients. In mid-1982, the Supreme Court vacated the judgment and remanded the case to the Court of Appeals for a determination of the extent to which the patients' substantive and procedural rights are protected under Massachusetts law, thus declining to reach the constitutional issues unnecessarily. *Mills* v. *Rogers,* 457 U.S. 291, 305 (1982).[7] On remand, the Court of Appeals certified nine questions to this court.

*Questions 1, 2, and 3. Competence of involuntarily committed patients to make treatment decisions; judicial determination of incompetence.*[8] "No person shall be deemed to be incompetent to manage his affairs, to contract, to hold professional or occupational or vehicle operators licenses or to make a will solely by reason of his admission or commitment in any capacity to the treatment or care of the [Mental Health] department or to any public or private facility."

---

[7] As we read the Supreme Court's opinion, it predicated its decision to remand on our intervening April, 1981, opinion, *Guardianship of Roe,* 383 Mass. 415 (1981), which the Court noted could significantly affect many of the issues in the case. Because the answers to the certified questions are controlled by Massachusetts statutory and common law, we do not discuss the issues under the State Constitution.

[8] Questions 1, 2, and 3 ("Non-Emergency Situations") are:

"1. Under state law, does the civil involuntary commitment of a person to a mental institution constitute a determination of incompetency to make treatment decisions?

"2. If not, does state law, in the absence of an emergency justifying exercise of the state's police power or an imminent threat to a patient's condition justifying exercise of the state's *parens patriae* power, require a probate court finding of incompetence and appointment of a guardian as the exclusive method for determining incompetency to make treatment decisions?

"3. If, in the circumstances described in question no. 2, probate proceedings are not the exclusive method to determine incompetency to make treatment decisions, what other procedure or procedures may be sufficient under state law?"

G. L. c. 123, § 25, inserted by St. 1970, c. 888, § 4. See 104 Code Mass. Regs. § 3.10 (2) (6) (1978). A judge may order the civil commitment of a person after a hearing only if he finds that the person is mentally ill and that the person's failure to be committed would create a likelihood of serious harm. G. L. c. 123, §§ 7, 8. The Legislature defined "[l]ikelihood of serious harm" as "(1) a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community." G. L. c. 123, § 1, as amended through St. 1980, c. 571, § 1. There is no requirement that a person be incompetent in order to be committed.

The first two definitions of likelihood of serious harm "provide no adjudication of judgmental capacity; commitment is based on a determination of risk of physical harm to the individual or to others." *Rogers II, supra* at 658. Put simply, such a commitment is for public safety purposes and does not reflect lack of judgmental capacity. The third definition, although more relevant to the person's judgmental abilities, says nothing concerning his competence to make treatment decisions. A person may be competent to make some decisions, but not others. *Matter of Moe,* 385 Mass. 555, 567-568 (1982). See Developments in the Law — Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1214 (1974). Furthermore, as the Court of Appeals noted, there is no way to pinpoint those patients committed under the third definition. Thus, "under the statutory scheme any given individual might have been committed despite the fact that he competently believed that treatment was not in

his best interests." *Rogers II, supra.* In addition, the Federal District Court judge found that most patients "are able to appreciate the benefits, risks, and discomfort that may reasonably be expected from receiving psychotropic medication." *Rogers I, supra* at 1361.

A determination of incompetence, on the other hand, is made by a judge who appoints a guardian only after he finds the person "incapable of taking care of himself by reason of mental illness." G. L. c. 201, § 6, as amended through St. 1978, c. 478, § 94. Thus, the statutes, as worded, comprehend the competence of an involuntarily committed mental patient to make treatment decisions. The fact that G. L. c. 123, § 23, expressly authorizes patients to refuse psychosurgery and electroconvulsive treatment does not, as the defendants assert, exclude by implication the patients' rights to make treatment decisions as to antipsychotic drugs. The right of an individual "to manage his own person" necessarily encompasses the right to make basic decisions with respect to "taking care of himself," *Fazio* v. *Fazio,* 375 Mass. 394, 403 (1978), including decisions relating to the maintenance of physical and mental health. We think it clear that the right to make treatment decisions is an essential element of the patient's general right "to manage his affairs."[9] G. L. c. 123, § 25. "[A] finding [of incompetence], apart from evidence as to mental illness, should consist of

[9] General Laws c. 111, § 70E, as amended by St. 1979, c. 720, enumerates certain patients' rights. Among them are the rights "to refuse to be examined, observed, or treated by students or any other facility staff without jeopardizing access to psychiatric, psychological, or other medical care" and "to informed consent to the extent provided by law." The 1979 amendment specifically extended these rights to patients in State mental hospitals.

Although it is not determinative of any issue, we note that the hospital in this case posted a sign stating: "You have the right to: . . . be informed of the risks and possible side effects of treatment, and to refuse treatment at any point." In their amicus brief, the American Psychiatric Association and the Massachusetts Psychiatric Society cite a study that states, "Permitting [patients] . . . to decline medication, not as a 'right' but as a matter of clinical policy, did not seriously impair their overall treatment and yielded some positive advantages." Appelbaum & Gutheil, Drug Refusal: A Study of Psychiatric Inpatients, 137 Am. J. Psychiatry 340, 345 (1980).

facts showing a proposed ward's inability to think or act for himself as to matters concerning his personal health, safety, and general welfare . . . ." *Fazio* v. *Fazio, supra* at 403. Absent such a finding, a person is competent to "act for himself as to matters concerning his personal health," including acceptance or refusal of medication. *Id.*[10] Thus, a person diagnosed as mentally ill and committed to a mental institution is still considered to be competent to manage his personal affairs. See *Commonwealth* v. *Sires,* 370 Mass. 541, 546 (1976); *Mitchell* v. *Mitchell,* 312 Mass. 165, 168 (1942); *Leggate* v. *Clark,* 111 Mass. 308, 309-310 (1873).

We conclude that a mental patient has the right to make treatment decisions and does not lose that right until the patient is adjudicated incompetent by a judge through incompetence proceedings. See G. L. c. 201, § 6. No other procedure is available for determining that a patient lacks the capacity to make treatment decisions. See *Guardianship of Roe, supra* at 431; *Fazio* v. *Fazio, supra* at 399; *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 755 (1977). Pursuant to G. L. c. 201, § 6, a judge may appoint a guardian for a person only if he finds after a hearing that the person "is incapable of taking care of himself by reason of mental illness." The statute provides for the appointment of temporary guardians, as well as for permanent guardians. See G. L. c. 201, § 14.

The defendants argue that they, as doctors, should be responsible for making treatment decisions for involuntarily committed patients, whether competent or not. We do not agree. "Every competent adult has a right 'to forego treatment, or even cure, if it entails what for him are intolerable

---

[10] The findings of the Federal District Court judge support the conclusion that most persons committed to a mental institution are competent to make treatment decisions. He found that "although committed mental patients do suffer at least some impairment of their relationship to reality, most are able to appreciate the benefits, risks, and discomfort that may reasonably be expected from receiving psychotropic medication. This is particularly true for patients who have experienced such medication and, therefore, have some basis for assessing comparative advantages and disadvantages." *Rogers I, supra* at 1361.

consequences or risks however unwise his sense of values may be in the eyes of the medical profession.'" *Harnish* v. *Children's Hosp. Medical Center,* 387 Mass. 152, 154 (1982), quoting *Wilkinson* v. *Vesey,* 110 R.I. 606, 624 (1972).[11] This right has constitutional and common law origins, *Guardianship of Roe, supra* at 433 n.9, which protect each person's "strong interest in being free from nonconsensual invasion of his bodily integrity." *Superintendent of Belchertown State School* v. *Saikewicz, supra* at 738-739. See *Ingraham* v. *Wright,* 430 U.S. 651, 673 (1977); *Breithaupt* v. *Abram,* 352 U.S. 432, 439 (1957); *Davis* v. *Hubbard,* 506 F. Supp. 915, 930-931 (N.D. Ohio 1980). Since by statute and by common law, involuntarily committed patients are competent until adjudicated incompetent, see *supra,* and because we have held that competent individuals have a right to refuse treatment, see *Harnish* v. *Children's Hosp. Medical Center, supra* at 154, the defendants' argument fails.

We conclude that a distinct adjudication of incapacity to make treatment decisions (incompetence) must precede any determination to override patients' rights to make their own treatment decisions. See *Matter of Moe,* 385 Mass. 555, 567-568 (1982). Other courts have drawn similar conclusions. See, e.g., *Rennie* v. *Klein,* 653 F.2d 836, 846 (3d Cir. 1981), vacated and remanded, 458 U.S. 1119 (1982); *Winters* v. *Miller,* 446 F.2d 65, 68 (2d Cir.), cert. denied, 404 U.S. 985 (1971); *New York City Health & Hosps. Corp.* v. *Stein,* 70 Misc. 2d 944, 945 (N.Y. Sup. Ct. 1972); *In re K.K.B.,* 609 P.2d 747, 749 (Okla. 1980); *In re Yetter,* 62 Pa. D. & C.2d 619, 623 (1973).

---

[11] Patients must receive appropriate information on which to exercise the voluntary choice to accept or reject antipsychotic drugs on an informed consent basis. See *Harnish* v. *Children's Hosp. Medical Center,* 387 Mass. 152 (1982); *Saikewicz, supra* at 739. "Appropriate information may include the nature of the patient's condition, the nature and probability of risks involved, the benefits to be reasonably expected, the inability of the physician to predict results, if that is the situation, the irreversibility of the procedure, if that be the case, the likely result of no treatment, and the available alternatives, including their risks and benefits." *Harnish, supra* at 156. Further, competent patients may, at any time, revoke their prior consent and refuse to continue with the treatment. Cf. note 22, *infra.*

Competency and substituted-judgment determinations may take place in the Probate Courts, see G. L. c. 215, § 6; in the Superior Court, see G. L. c. 214, § 1 (general equity jurisdiction of the Superior Court); G. L. c. 215, § 6 (concurrent jurisdiction of the Probate and Superior Courts as to "all matters relative to guardianship and conservatorship"); *Custody of a Minor,* 375 Mass. 733, 743-744 (1978); or in the Juvenile Courts or juvenile sessions of the District Courts, see G. L. c. 119, § 24; *Custody of a Minor, supra* at 742-743. Whatever the forum, the patient must be found incompetent before a judge may make a substituted-judgment decision. We note that, whenever possible, proceedings should be consolidated. See, e.g., *Glick* v. *Greenleaf,* 383 Mass. 290, 294-295 & n.7 (1981); G. L. c. 211B, § 9, inserted by St. 1978, c. 478, § 110 (power of Chief Administrative Justice to transfer judges and cases "as he deems will best promote the speedy dispatch of judicial business").[12]

*Questions 4 and 5. The decision to treat incompetent mental patients with antipsychotic drugs.*[13] In Massachusetts there is "a general right in all persons to refuse medical treatment in appropriate circumstances. The recognition of that right must extend to the case of an incompetent, as well as a competent, patient because the value of human

---

[12] The Chief Administrative Justice has issued an informational memorandum on the procedure to consolidate legal matters. The Chief Administrative Justice of the Trial Court may "authorize a justice to sit simultaneously as a justice of several Departments to reduce delay and duplication in actions pending in the Trial Court." Informational Memorandum: Procedure for Requesting Judicial Assignments to Address Related Actions Entered in Different Departments of the Trial Court. Editorial note to G. L. c. 211B, § 9, Mass. Ann. Laws (Supp. 1983).

[13] Questions 4 and 5 ("Non-Emergency Situations") are:

"4. If a proper determination of incompetency to make treatment decisions has been made, and in the absence of an emergency justifying exercise of the state's police power or an imminent threat to a patient's condition justifying exercise of the state's *parens patriae* power, under state law must there be a substituted judgment decision, or other decision by a person aside from the incompetent, prior to the administration of psychotropic drugs?

"5. If so, who may make such a decision, what procedures must be followed, and what factors must be considered?"

dignity extends to both. . . . To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons." *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 745-746 (1977). See Gaughan & LaRue, The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution, 4 Law & Psychology Rev. 43, 74 (1978). Further, "if an incompetent individual refuses antipsychotic drugs, those charged with his protection must seek a judicial determination of substituted judgment." *Guardianship of Roe, supra* at 434-435.[14] See *Custody of a Minor (No. 1),* 385 Mass. 697, 710 n.10 (1982). See also *Matter of Moe,* 385 Mass. 555, 565 (1982); *Matter of Spring,* 380 Mass. 629, 640 (1980); *Custody of a Minor,* 375 Mass. 733, 752-753 (1978); *Superintendent of Belchertown State School* v. *Saikewicz, supra* at 745-751.

A substituted-judgment decision is distinct from a decision by doctors as to what is medically in the "best interests" of the patient. *Guardianship of Roe, supra* at 435. "[T]he goal is to determine with as much accuracy as possible the wants and needs of the individual involved." *Superintendent of Belchertown State School* v. *Saikewicz, supra* at 750. The decision "should be that which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person," *id.* at 752-753, and giving "the fullest possible expression to the character and circumstances of that individual," *id.* at 747. Use of the substituted judgment standard is not

---

[14] We focus on patients who refuse treatment, because we anticipate that it is in this context that the issues will generally arise. Because a person is competent until adjudicated incompetent, see G. L. c. 201, § 6; *supra* at 490-491, a patient's acceptance of antipsychotic drugs ordinarily does not require judicial proceedings. We add, however, that, because incompetent persons cannot meaningfully consent to medical treatment, a substituted judgment by a judge should be undertaken for the incompetent patient even if the patient accepts the medical treatment.

unique to Massachusetts. See, e.g., *In re Boyd*, 403 A.2d 744, 750-751 (D.C. 1979). The decision is not simply a question whether treatment is to be rendered, but also may entail a choice between alternative treatments. The doctor must offer treatment to the involuntarily committed patient, but, since it is the patient who bears the risks as well as the benefits of treatment by antipsychotic drugs, and must suffer the consequences of any treatment decision, the patient has the right to make that decision.[15] In short, treatment decisions are the patient's prerogative solely.

"[O]ur prior cases have established that prior judicial approval is required before a guardian may consent to administering or withholding of proposed extraordinary medical treatment." *Matter of Moe*, 385 Mass. 555, 559 (1982). Since we have decided that treatment with antipsychotic drugs is such an extraordinary treatment,[16] we necessarily conclude that court approval is mandatory before forcible

---

[15] Even if the patient's choice will not achieve the restoration of the patient's health, or will result in longer hospitalization, that choice must be respected. The patient has the right to be wrong in the choice of treatment. We have rejected the State interest in helping citizens to "function at the maximum level of their capacity." *Guardianship of Roe, supra* at 449. Although the State may occasionally "have a generalized parens patriae interest in removing obstacles to individual development, this general interest does not outweigh the fundamental individual rights here asserted." *Id.* Improvement of the individual's health and prevention of crises in a patient's disease may be considered if there is to be a substituted judgment decision, but those considerations in and of themselves are not sufficient to override the patient's right of self-determination. *Guardianship of Roe, supra* at 447.

[16] In *Guardianship of Roe, supra,* we decided that (1) there are "few legitimate medical procedures which are more intrusive than the forcible injection of antipsychotic medication," *id.* at 436; (2) the side effects of antipsychotic drugs "are frequently devastating and often irreversible," *id.* at 438; (3) the situation at issue there, as here, was not one "which could accurately be described as an emergency," *id.* at 440; and (4) judicial appointment of the guardian and the judge's determination of incompetency is "significant and inescapable prior judicial involvement," *id.* at 442. These circumstances do not differ materially when the incompetent person is institutionalized. See generally Comment, Medication and Adjudication: Extending *In re Richard Roe III* to Institutionalized Psychiatric Patients, 17 New Eng. L. Rev. 1029 (1982).

medication of an incompetent patient with those drugs in a nonemergency situation can take place.

The amici American Psychiatric Association and Massachusetts Psychiatric Society, arguing on behalf of the psychiatric profession, urge us not to require a substituted judgment by a judge for institutionalized incompetent mentally ill patients. They assert that if a substituted judgment is required before there can be forcible medication of involuntarily confined, incompetent patients, the decision as to substituted judgment should be made by a qualified physician and not a judge. This procedure, the so called medical model, would, the doctors claim, protect the incompetent patient's civil rights to refuse treatment,[17] while providing the hospital with a qualified person who can make the substituted judgment decision at the hospital. See, e.g., A. Stone, Mental Health and Law: A System in Transition 65-66 (1975). The medical model is also advantageous, the doctors claim, because it provides flexibility and avoids the adversary quality of judicial proceedings. The doctors thus conclude that if a substituted-judgment is required, the medical model is the appropriate procedure for this court to follow. We do not agree. "No medical expertise is required [for making the substituted judgment decision], although medical advice and opinion is to be used for the same purposes and sought to the same extent that the incompetent individual would, if he were competent." *Guardianship of Roe*, supra at 435. See *Custody of a Minor (No. 1)*, 385 Mass. 697, 713-714 (1982); *Matter of Moe*, 385 Mass. 555, 559 (1982); *Matter of Spring*, 380 Mass. 629, 636 (1980); *Superintendent of Belchertown State School* v. *Saikewicz*, supra at 759.

The only relevant fact which differs between *Guardianship of Roe* and this case is that the incompetent patient in *Guardianship of Roe* was not institutionalized. The de-

---

[17] Dr. Stone, however, also observes that "[i]f the decisionmaker is not a judge, . . . it will be difficult to insure the patient's civil liberties." A. Stone, Mental Health and Law: A System in Transition 104 (1975). Implicit in Dr. Stone's assessment is the recognition that the goal of restoration of a patient's health and the patient's civil rights may conflict.

fendants argue that the mere fact of institutionalization and the needs of the hospital[18] should be sufficient to transfer the treatment decision authority from the judge to the doctors. "[I]f the doctrines of informed consent and right of privacy [that underlie the substituted judgment determination] have as their foundations the right to bodily integrity, see *Union Pac. Ry.* v. *Botsford,* 141 U.S. 250 (1891), and control of one's own fate, then those rights are superior to the institutional considerations." *Superintendent of Belchertown State School* v. *Saikewicz, supra* at 744. See *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 265-266 (1979).

In *Guardianship of Roe,* 383 Mass. 415, 435-436 (1981), and in *Matter of Spring,* 380 Mass. 629, 637 (1980), we outlined the various factors to be considered in determining whether a judicial substituted-judgment decision is required. Five of these discussed in *Guardianship of Roe, supra,* were "(1) the intrusiveness of the proposed treatment, (2) the possibility of adverse side effects, (3) the absence of an emergency, (4) the nature and extent of prior judicial involvement, and (5) the likelihood of conflicting interests."

The fact that a patient has been institutionalized and declared incompetent brings into play the factor of the likelihood of conflicting interests. See *Guardianship of Roe, supra* at 435-436. The doctors who are attempting to treat as well as to maintain order in the hospital have interests in conflict with those of their patients who may wish to avoid medication.[19] On the other hand, unlike the situation in

---

[18] The facts as found in *Rogers I* do not support the defendants' position. The judge found that "the great majority of patients [did] not [decline] their psychotropic medication during the pendency of the [Federal District Court's] temporary restraining order. Most of those who did changed their minds within a few days." *Rogers I, supra* at 1370. The doctors' ability to establish a therapeutic environment in treating the patients was not substantially reduced, which "speaks well for the confidence in a doctor's judgment . . . [when the doctor makes] the effort to establish a strong therapeutic alliance." *Id.*

[19] Economic considerations may also create conflicts between doctors and patients. Because medication with antipsychotic drugs "saves time,

*Guardianship of Roe,* if an incompetent has a guardian, that guardian presumably is in a neutral position, since the guardian is not living with the patient at the time the guardian makes the treatment decisions. In *Guardianship of Roe, supra* at 443, we noted the difficulty in making a "substituted judgment determination . . . when the ward . . . is living at home with other children."

We conclude that, if a patient is declared incompetent, a court must make the original substituted-judgment treatment decision and should approve a substituted judgment treatment plan. See 104 Code Mass. Regs. § 3.08 (3) (1978). After adjudication of an involuntarily committed patient as incompetent, the judge may conduct a hearing on the appropriate treatment to be administered. See *Davis* v. *Hubbard,* 506 F. Supp. 915, 938-939 (N.D. Ohio 1980). The parties "must be given adequate notice of the proceedings, an opportunity to be heard in the trial court, and to pursue an appeal." *Matter of Moe,* 385 Mass. 555, 566 (1982). To this end, a guardian ad litem should be appointed, and the opinions of experts gathered so that all views are available to the judge. *Id.* at 567. *Saikewicz, supra* at 756-758. The judge may delegate to a guardian the power to monitor the treatment process to ensure that the substituted-judgment treatment plan is followed.[20]

money, and people," Zander, Prolixin Decanoate: Big Brother by Injection? 5 J. Psychiatry & L. 55, 56 (1977), the temptation to engage in blanket prescription of such drugs to maintain order and compensate for personnel shortages may be irresistible. See *Guardianship of Roe, supra* at n.11 (citation to literature documenting "abuses of antipsychotic medication by those claiming to act in an incompetent's best interests"); *Rogers I, supra* at 1377 n.45 (decision to seclude for a period longer than necessary caused by "environmental" factors such as staff shortages and patient load).

[20] The guardian must be readily available, or the court must take on the monitoring role. If no neutral guardian is available, the court may act in the place of a guardian under the broad, flexible equitable powers granted by G. L. c. 215, § 6 (Probate Court), or G. L. c. 214, § 1 (Superior Court), or the special equitable power granted to the Juvenile Courts or juvenile sessions of District Courts by G. L. c. 119, § 24.

At least six factors must be considered by the judge in arriving at the substituted judgment decision. "In this search, procedural intricacies and technical niceties must yield to the need to know the actual values and preferences of the ward." *Guardianship of Roe, supra* at 444. These six factors are detailed in *Guardianship of Roe, supra,* and we briefly restate them here.

First, the judge must examine the patient's "expressed preferences regarding treatment." *Guardianship of Roe, supra* at 444. If made while competent, such a preference "is entitled to great weight" unless the judge finds that the patient would have changed his opinion after reflection or in altered circumstances. *Id.* at 445. Even if he lacked the capacity to make his treatment decisions at the time, his expressed preference "must be treated as a critical factor in the determination of his 'best interests,'" *id.,* quoting *Doe v. Doe,* 377 Mass. 272, 277-279 (1979), since it is the patient's true desire that the court must ascertain.

Second, the judge must evaluate the strength of the incompetent patient's religious convictions, to the extent that they may contribute to his refusal of treatment. See *Winters v. Miller,* 446 F.2d 65 (2d Cir. 1971); *In re Boyd,* 403 A.2d 744 (D.C. 1979). "[T]he question to be addressed is whether certain tenets or practices of the incompetent's faith would cause him individually to reject the specific course of treatment proposed for him in his present circumstances. . . . While in some cases an individual's beliefs may be so absolute and unequivocal as to be conclusive in the substituted judgment determination, in other cases religious practices may be only a relatively small part of the aggregated considerations." *Guardianship of Roe, supra* at 445-446.

Third, the impact of the decision on the ward's family must be considered. In *Guardianship of Roe, supra* at 446, we indicated that this factor is primarily relevant when the patient is part of a closely knit family. The consideration of impact on the family includes the cost in money and time that the family must bear, together with any desire of the patient to minimize that burden. In addition, a patient

may be faced with "two treatments, one of which will allow him to live at home with his family and the other of which will require the relative isolation of an institution." *Id.* The judge may then consider what affection and assistance the family may offer. However, the judge must be careful to ignore the desires of institutions and persons other than the incompetent "except in so far as they would affect his choice." *Id.* at 447.

Fourth, the probability of adverse side effects must be considered. This includes an analysis of "the severity of these side effects, the probability that they would occur, and the circumstances in which they would be endured." *Id.*[21]

Fifth, the prognosis without treatment is relevant to the substituted judgment decision. It is probable that most patients would wish to avoid a steadily worsening condition. However, the judge must again reach an individualized, subjective conclusion regarding this factor, after examining it from the "unique perspective," *Saikewicz, supra* at 747, of the incompetent, *Guardianship of Roe, supra* at 447.

Sixth, the prognosis with treatment must be examined. The likelihood of improvement or cure enhances the likelihood that an incompetent patient would accept treatment, but it is not conclusive.

Finally, the judge may review any other factors which appear relevant. *Guardianship of Roe, supra* at 448. See, e.g., note 15, *supra*, and note 26, *infra*. After weighing the factors, the judge must reach a substituted-judgment treatment decision. If the judge decides to order treatment with antipsychotic drugs for a committed incompetent patient, the judge should "authorize a treatment program which

---

[21] Dangerous side effects can occur even if the drugs are "responsibly and competently administered, with great care and consideration for the patient." Brooks, The Constitutional Right to Refuse Antipsychotic Medications, 8 Bull. Am. Acad. of Psychiatry and L. 179, 183 (1980). For a description of the adverse side effects of antipsychotic drugs, see *Guardianship of Roe, supra* at 438-440; Brooks, The Constitutional Right to Refuse Antipsychotic Medications, *supra* at 183-188; A Common Law Remedy For Forcible Medication of the Institutionalized Mentally Ill, 82 Colum. L. Rev. 1720, 1726-1727 (1982).

utilizes various specifically identified medications adminis-
tered over a prolonged period of time. In such a case, the
order should provide for periodic review to determine if
the ward's condition and circumstances have substantially
changed." *Guardianship of Roe, supra* at 448 n.19. Once the
decisions of incompetency and substituted judgment have
been made,[22] the burden shifts to the incompetent patient's
guardian to seek modification of the order, should such
modification be needed before the time for periodic review.

*Questions 6 and 7. "Police power" and the use of anti-
psychotic drugs.*[23] The defendants assert that if they are
unable to medicate, hospital administration becomes more
difficult, lengths of stay increase, fewer patients can be
treated, staff turnover increases and new personnel become
more difficult to attract. The defendants also argue that
the illness of one patient on a ward may be provocative, ex-
acerbating the illness of other patients, and adversely affect-
ing the doctors' ability to treat. See *Rennie* v. *Klein,* 462
F. Supp. 1131, 1152 n.1 (D. N.J. 1978), remanded, 653
F.2d 836 (3d Cir. 1981), vacated and remanded, 458 U.S.
1119 (1982). In addition, they claim it is more difficult to
conduct group therapy in an environment in which they can-
not medicate with antipsychotic drugs. However, govern-
mental interest "in permitting hospitals to care for those in
their custody [is] not controlling, since a patient's right of
self-determination [is] normally . . . superior to such institu-
tional considerations." *Commissioner of Correction* v. *Myers,*
379 Mass. 255, 266 (1979). See *Saikewicz, supra* at 744.

---

[22] Guardians must be given appropriate information in order to per-
form their function. See note 11, *supra.*

[23] Question 6 ("Non-Emergency Situations") is:
"6. Under state law, after a proper decision to refuse medication has
been made, what state interest or interests would be sufficiently compel-
ling to overcome the interest of the individual in refusing treatment with
antipsychotic drugs?"
Question 7 ("Emergency Situations") is:
"7. What standards and procedures are required under state law to
make a decision forcibly to medicate an involuntarily committed patient
under the state's police power?"

In *Guardianship of Roe, supra* at 437 n.11, we noted that "[c]ommentators and courts have identified abuses of antipsychotic medication by those claiming to act in an incompetent's best interests." In *Rogers I, supra* at 1375-1376, 1378 & n.49, the judge found that patients were involuntarily medicated with antipsychotic drugs over their objection in nonemergency situations. Cf. *id.* at 1377 n.45. In *Davis v. Hubbard*, 506 F. Supp. 915, 926 (N.D. Ohio 1980), the judge found that seventy-three per cent of the patients of Lima (Ohio) State Hospital received psychotropic drugs, and that the high prescription rate "can be justified only for reasons other than treatment — namely, for the convenience of the staff and for punishment." See *Rennie v. Klein*, 476 F. Supp. 1294, 1299 (D. N.J. 1979), modified and remanded, 653 F.2d 836 (3d Cir. 1981), vacated and remanded, 458 U.S. 1119 (1982) ("[T]he medical director of Marlboro [New Jersey State Hospital] states in an office memorandum that the hospital 'uses medication as a form of control and as a substitute for treatment'"); *Halderman v. Pennhurst State School & Hosp.*, 446 F. Supp. 1295, 1307 (E.D. Pa. 1977), modified on other grounds, 612 F.2d 84, 93 (3d Cir. 1979) ("[d]angerous psychotropic drugs are used [on mentally retarded persons] for purposes of behavior control and staff convenience, rather than for legitimate treatment needs"), rev'd and remanded on other grounds, 451 U.S. 1 (1981), aff'd in part, rev'd and remanded in part on other grounds, 673 F.2d 647 (3d Cir.), cert. granted on an unrelated issue, 457 U.S. 1131 (1982); *Clites v. State*, 322 N.W.2d 917, 921 (Iowa App. 1982) (damages awarded where major tranquilizers used on mentally retarded child "as a convenience or expediency program rather than a therapeutic program"); A Common Law Remedy For Forcible Medication of the Institutionalized Mentally Ill, 82 Colum. L. Rev. 1720, 1721 n.9 (1982) (describing cases in which antipsychotic drugs were found to be used "for the convenience of the staff and for punishment of patients"). See also Brooks, The Constitutional Right to Refuse Antipsychotic Medications, 8 Bull. Am. Acad. of Psychiatry & L. 179, 206 (1980)

("staff too often abuses the management function of medications and slips into the use of medications for its own convenience"); Opton, Psychiatric Violence Against Prisoners: When Therapy is Punishment, 45 Miss. L.J. 605, 623 (1974) ("[I]n mental institutions the bureaucratic needs of the institution for passivity, obedience and submission take precedence over the therapeutic needs of the patients for development of autonomy, initiative, and self-control"); Crane, Clinical Psychopharmacology in its 20th Year, 181 Sci. 124, 125 (1973) ("drugs are prescribed to solve all types of management problems").

Nevertheless, psychiatric institutions must offer protection to third persons, whether staff members or patients, and must preserve security within the institution. See *Commissioner of Correction* v. *Myers, supra.* However, when public safety and security are a consideration in the decision to administer antipsychotic drugs over a patient's objection, the "antipsychotic drugs function as chemical restraints forcibly imposed upon an unwilling individual who, if competent, would refuse such treatment." *Guardianship of Roe, supra* at 451. In such circumstances, the antipsychotic drug treatment is administered for the benefit of others, and the statutory and regulatory conditions for the use of chemical restraints must be followed.[24]

General Laws c. 123, § 21, as amended by St. 1978, c. 367, § 71F, requires that State mental health patients may be restrained "only in cases of emergency such as the occurrence of, or serious threat of, extreme violence, personal injury, or attempted suicide."[25] In no case may chemical means of restraint be used without "written authorization . . . in

---

[24] The American Psychiatric Association and the Massachusetts Psychiatric Society concede that the Massachusetts regulations do not permit the use of chemical restraints for disciplinary purpose or administrative convenience.

[25] We have defined "emergency" as "an unforeseen combination of circumstances or the resulting state that calls for immediate action." *Guardianship of Roe, supra* at 440, quoting Webster's Third New Int'l Dictionary 741 (1961). We adhere to that definition.

advance by the superintendent or director of the I.C.U. or by a physician designated by him for this purpose."

Consistent with G. L. c. 123, § 21, the Massachusetts Department of Mental Health has adopted regulations on the use of seclusion and restraint. In 104 Code Mass. Regs. § 3.12 (2) (1978), those regulations state: "Restraint or seclusion of patients may be used only in emergency situations where there is the occurrence or serious threat of extreme violence, personal injury, or attempted suicide." "Restraint" is defined in 104 Code Mass. Regs. § 3.12 (3) (1978) to include mechanical, chemical, and therapeutic restraints. Authorization for the use of seclusion or restraint must be made in advance and in writing by the head of the hospital or a designated physician, and the person authorizing the restraint must also sign the treatment form, pursuant to 104 Code Mass. Regs. § 3.12 (5) (1978). If the head of the hospital or his designee is not available, only nonchemical restraints may be used. Record keeping and other requirements are detailed elsewhere in 104 Code Mass. Regs. § 3.12 (1978).

The use of chemicals to restrain State mental patients is limited to emergencies in which the patient harms, or threatens to harm, himself or others. See note 25, *supra.* We know of no reason why these rules regarding restraint should not be followed. The defendants suggest none. The statutes and regulations are clearly intended to set forth the exclusive means for use of chemical restraints, which include antipsychotic drugs. Use of the word "only" in G. L. c. 123, § 21, means "for no other purpose." Webster's New Int'l Dictionary 1703 (2d ed. 1959). The statutory language permits the use of antipsychotic drugs as restraints only in specific, limited circumstances and does not allow expansion by doctors or courts.

We conclude that only if a patient poses an imminent threat of harm to himself or others, and only if there is no less intrusive alternative to antipsychotic drugs, may the Commonwealth invoke its police powers without prior court

approval to treat the patient[26] by forcible injection of anti-psychotic drugs over the patient's objection. No other State interest is sufficiently compelling to warrant the extremely intrusive measures necessary for forcible medication with antipsychotic drugs. Any other result also would negate the Legislature's decision to regulate strictly the use of mind altering drugs as restraints.

*Questions 8 and 9. Forcible antipsychotic medication essential to prevent "immediate, substantial, and irreversible deterioration of a serious mental illness."*[27] We have rejected the broad, traditional parens patriae power invoked by a State to do what is best for its citizens despite their own wishes, see *Guardianship of Roe, supra* at 449 (State "interest in seeing that its residents function at the maximum level of their capacity . . . does not outweigh the fundamental individual rights here asserted"), and instead have adopted the substituted judgment-standard as the norm, see *Saikewicz, supra* at 751-752.

However, the State may, in rare circumstances, override a patient's refusal of medication under its so called "parens patriae" powers, even though no threat of violence exists. A patient may be treated against his will to prevent the "immediate, substantial, and irreversible deterioration of a serious mental illness," *Guardianship of Roe, supra* at 441, in

---

[26] The defendants suggest that certain patients, as a symptom of their illness, will periodically threaten violence. Predictable crises are not within the definition of emergency. See note 25, *supra.* Therefore, in those cases, the consent of the patient for medication with antipsychotic drugs must be obtained in advance, while the patient is competent and calm. If the patient has been declared incompetent, the periodic episodes of violence should be considered in formulating the substituted-judgment treatment plan.

[27] Questions 8 and 9 ("Emergency Situations") are:

"8. Under state law is there a *parens patriae* state interest in situations where the delay that would be occasioned by ordinary recourse to the properly designated decisionmaker could cause a serious deterioration in the condition of the patient?

"9. If so, under state law, what procedures must be followed and what standard of decisionmaking must be applied to those situations?"

cases in which "even the smallest of avoidable delays would be intolerable," *id.*[28]

In such a situation, interim treatment may be given to an incompetent patient, or to one whom doctors, in the exercise of their professional judgment, believe to be incompetent. If a patient is medicated in order to avoid the "immediate, substantial, and irreversible deterioration of a serious mental illness," *Guardianship of Roe, supra* at 441, and the doctors determine that the antipsychotic medication should continue and the patient objects, the doctors must seek an adjudication of incompetence[29] and if, after hearing, the patient is found to be incompetent, the judge should make a substituted judgment treatment plan determination.[30]

*Conclusion.* Our answers to the certified questions are:

1. The involuntary commitment of a mental patient is not a determination that he is incompetent to make treatment decisions.

2. Incompetence must be determined by a judge in accordance with the statutory provisions.

3. Competency and substituted-judgment determinations may be made in a Probate Court, the Superior Court, a Juvenile Court, or a juvenile session of a District Court.

4. A substituted judgment treatment decision must be made for an involuntarily committed patient who has been adjudicated to be incompetent before the patient can be forcibly medicated with antipsychotic drugs.

5. A judge must make the substituted-judgment decision and should approve a treatment plan after notice and a

---

[28] This issue was not before us in *Guardianship of Roe*, where there was only the possibility that "the ward's schizophrenia might deteriorate into a chronic, irreversible condition at an uncertain but relatively distant date." *Guardianship of Roe, supra* at 440.

[29] The Probate Court has expedited hearing procedures. See G. L. c. 201, §§ 7, 14, and Rule 29B of the Probate Court, as amended, (1982).

[30] Obviously, if a patient is found to be competent, the doctors may not forcibly medicate that patient over his objection, despite the fact that the patient's condition may deteriorate. See 497-498, *supra* (competent patient has right to forgo treatment).

hearing. The guardian should monitor the treatment plan. In making the substituted-judgment decision, the judge should consider the six factors detailed in *Guardianship of Roe, supra* at 444, as well as any other relevant factors.

6. In a nonemergency situation, no State interest is sufficiently compelling to overcome a patient's decision to refuse treatment with antipsychotic drugs.

7. The Commonwealth's police power permits forcible medication as a chemical restraint over a patient's objection in an emergency. Such use must comply with G. L. c. 123, § 21, and 104 Code Mass. Regs. § 3.12 (1978).

8. Forcible treatment with antipsychotic drugs may be given to a patient to prevent the "immediate, substantial, and irreversible deterioration of a serious mental illness."

9. If the doctors determine that administration of the antipsychotic drugs, prescribed to prevent the "immediate, substantial, and irreversible deterioration of a serious mental illness," should continue, they must seek an adjudication of incompetency, and if the patient is adjudicated incompetent, a substituted-judgment treatment plan.