IN THE MATTER OF EARLE N. SPRING.

Franklin. January 10, 1980. — May 13, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Medicine,* Withholding medical treatment. *Probate Court,* Withholding
medical treatment, Incompetent person. *Incompetent Person,* Con-
sent to medical treatment, Right to refuse medical treatment. *Privacy.*

Discussion of circumstances in which there should be an application for
a prior court order with respect to medical treatment of an incompe-
tent patient. [636-639]
When a court is properly presented with the legal question whether
medical treatment may be withheld from an incompetent patient, it
must decide that question and not delegate it to some private person or
group. [639]
In a proceeding on a petition by a guardian for an order that no life-
prolonging medical treatment be administered to the ward by his
physician, there was sufficient evidence to warrant the judge's finding
that the ward, if competent, would choose not to receive the life-
prolonging treatment. [640-641]
Where nine months had elapsed between an evidentiary hearing and the
entry of this court's order remanding the case to the Probate Court for
the entry of a new judgment ordering a temporary guardian to refrain
from authorizing further life-prolonging treatment for his ward except
by order of the Probate Court, this court emphasized that the judge
might issue a further order upon receiving evidence of significant
change in the condition of the ward or in the treatment available for
him or other evidence leading to revision of his findings. [641-642]

PETITION filed in the Franklin Division of the Probate and
Family Court Department on January 25, 1979.

The case was heard by *Keedy,* J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Mark I. Berson,* guardian ad litem, pro se.
*Marguerite M. Dolan* for the petitioners.

*George J. Annas & Leonard H. Glantz,* for the American Society of Law & Medicine, Inc., amicus curiae, submitted a brief.

*Lee J. Dunn, Jr., Nancy E. Ator, Patricia D. King, William H. Roach, Jr., Kenneth C. Robbins & Miles J. Zaremski,* for the Illinois Association of Hospital Attorneys, amicus curiae, submitted a brief.

*Ronald B. Schram, Michael J. Beautyman & Patrick R. Carroll,* for the Massachusetts Hospital Association, Inc., amicus curiae, submitted a brief.

*Stanley V. Ragalevsky, Karen J. Bloom & Thomas M. Reardon,* for the Massachusetts Medical Society, amicus curiae, submitted a brief.

*Jonathan Brant & Thomas F. O'Hare,* for the Mental Health Legal Advisors Committee, amicus curiae, submitted a brief.

BRAUCHER, J. Earle N. Spring, an incompetent person, was receiving life-prolonging hemodialysis treatment. On the petition of his wife and his son, who was his temporary guardian, a judge of the Probate Court found that the ward "would, if competent, choose not to receive the life prolonging treatment," and ordered the entry of judgment that "the ward's attending physician together with the ward's wife and son are to make the decision with reference to the continuance or termination of the dialysis treatment." The Appeals Court affirmed the judgment. *Matter of Spring,* 8 Mass. App. Ct. 831 (1979).

We allowed an application by the guardian ad litem for further appellate review. We concluded that the finding quoted above was warranted by the evidence, but on the authority of *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728 (1977), we concluded that it was error to delegate the decision to the attending physician and the ward's wife and son. We issued an order reversing the judgment of the Probate Court and remanding the case for the entry of a new judgment ordering the temporary guardian to refrain from authorizing any further life-prolonging treatment except by further order of the Probate Court. We

emphasized that the judge might issue a further order "upon receiving evidence of significant change in the condition of the ward or in the treatment available for him or other evidence leading to revision of his findings." We said that a rescript and opinion would follow, and we now issue that opinion.

1. *The proceedings.* In November, 1978, the son filed a petition that he be appointed conservator of the property of his father, and the appointment was made on January 16, 1979. On January 25, 1979, the son was appointed temporary guardian of his father, and the same day the son and the wife of the ward filed a petition for an order that no life-prolonging medical treatment be administered to the ward by his physicians. The probate judge appointed a guardian ad litem, who filed a report on February 12, 1979.

After an evidentiary hearing on April 5, the judge on May 15, 1979, ordered that the temporary guardian refrain from authorizing any further life-prolonging medical treatment. On motion of the guardian ad litem the order was stayed, and the guardian ad litem appealed to the Appeals Court. After further consideration, on July 2, 1979, the judge filed "Findings, Rulings and Order for Entry of Judgment," vacated the order of May 15, and ordered the entry of judgment that "the ward's attending physician together with the ward's wife and son are to make the decision with reference to the continuance or termination of the dialysis treatment."

The July 2 judgment was stayed, but no further appeal was taken, and no application was made for direct appellate review by this court. The case was argued in the Appeals Court in September, and an opinion affirming the July 2 judgment was released on December 21, 1979. The guardian ad litem filed an application for further appellate review on December 31, 1979. The case was argued before this court on January 10, 1980, and our order was issued January 14, 1980.[1]

---

[1] After our order of January 14, 1980, the guardian ad litem raised the question whether there had been adequate evaluation of the ward's com-

2. *The facts.* The evidence is described in detail in the opinion of the Appeals Court. We here summarize the facts shown, which were substantially undisputed. The ward was born in 1901, had been married for fifty-five years at the time of the hearing, and had one son, the temporary guardian. The ward was suffering from "end-stage kidney disease," which required him to undergo hemodialysis treatment (filtering of the blood) three days a week, five hours a day. He also suffered from "chronic organic brain syndrome," or senility, and was completely confused and disoriented. Both the kidney disease and the senility were permanent and irreversible; there was no prospect of a medical breakthrough that would provide a cure for either disease. Apart from the kidney disease and senility the ward's health was good.

Without the dialysis treatment the ward would die; with it he might survive for months. Survival for five years would be not probable, but conceivable. The treatment did not cause a remission of the disease or restore him even temporarily to a normal, cognitive, integrated, functioning existence, but simply kept him alive. He experienced unpleasant side effects such as dizziness, leg cramps, and headaches; on occasion he kicked nurses, resisted transportation for dialysis, and pulled the dialysis needles out of his arm. His disruptive behavior was controlled through heavy sedation. He would not have suffered any discomfort if the dialysis had been terminated. There was no evidence that

petence. Further proceedings before the probate judge and before a single justice of this court resulted in an order for the continuance of treatment and the appointment of five physicians to examine the ward, with particular reference to his competence to decide whether life-prolonging treatment should be continued or terminated. The physicians filed written reports with the Probate Court. The reports gave detailed confirmation of the judge's earlier findings and concluded that the ward's condition had deteriorated both mentally and physically and that he remained entirely and irreversibly incompetent. Before a hearing could be held suggestions were filed that the ward had died on April 6, 1980. The death certificate gives cardio-respiratory failure due to arteriosclerotic heart disease as the immediate cause of death, not related to the patient's chronic renal failure and chronic organic brain syndrome.

while competent he had expressed any wish or desire as to the continuation or withdrawal of treatment in such circumstances, but his wife and son were of the opinion that if competent he would request withdrawal of treatment.

3. *The legal setting.* This is another in a series of recent cases in which we have been called upon to apply legal principles to questions of life and death presented by modern medical procedures. *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977) (order withholding chemotherapy from incompetent and profoundly retarded leukemia patient at State school). *Custody of a Minor*, 375 Mass. 733 (1978) (order permitting chemotherapy for a minor leukemia patient over parental objection). *Custody of a Minor (No. 3)*, 378 Mass. 732 (1979) (same). *Commissioner of Correction* v. *Myers*, 379 Mass. 255 (1979) (order for involuntary hemodialysis for prisoner). See *Commonwealth* v. *Golston*, 373 Mass. 249, 252-256 (1977), cert. denied, 434 U.S. 1039 (1978) (upholding finding of "brain death" before removal of respirator from murder victim); *Commonwealth* v. *Edelin*, 371 Mass. 497, 516-517 (1976) (insufficient evidence of recklessness of physician with respect to aborted fetus); *Matter of Dinnerstein*, 6 Mass. App. Ct. 466 (1978) (declaration that validity of order not to resuscitate patient with Alzheimer's disease did not depend on prior court approval); *Lane* v. *Candura*, 6 Mass. App. Ct. 377 (1978) (denial of authority to amputate leg of nonconsenting competent adult).

Similar questions have arisen in other jurisdictions as well. *Rogers* v. *Okin*, 478 F. Supp. 1342, 1360-1371 (D. Mass. 1979) (injunction against involuntary treatment of mental patients with psychotropic drugs). *In re Boyd*, 403 A.2d 744 (D.C. App. 1979) (remand to consider bearing of incompetent patient's religious beliefs on her putative rejection of psychotropic drugs). *Satz* v. *Perlmutter*, 362 So. 2d 160 (Fla. Dist. Ct. App. 1978) (authorizing removal of respirator as desired by competent, terminally ill patient). *In re Quinlan*, 70 N.J. 10, cert. denied sub nom. *Garger* v. *New Jersey*, 429 U.S. 922 (1976) (authorizing removal of

respirator from patient in irreversible vegetative coma). *Matter of Eichner,* 73 App. Div. 2d 431 (N.Y. 1980) (same). Those cases, particularly the *Quinlan* and *Saikewicz* cases, have been the subject of voluminous discussion in both medical and legal literature. See, e.g., Annas, Reconciling *Quinlan* and *Saikewicz*: Decision Making for the Terminally Ill Incompetent, 4 Am. J. of L. & Med. 367 (1979); Cantor, *Quinlan,* Privacy, and the Handling of Incompetent Dying Patients, 30 Rutgers L. Rev. 243 (1977).

These materials suggest that there is something approaching consensus in support of some of the principles elaborated in the *Saikewicz* opinion. A person has a strong interest in being free from nonconsensual invasion of his bodily integrity, and a constitutional right of privacy that may be asserted to prevent unwanted infringements of bodily integrity. Thus a competent person has a general right to refuse medical treatment in appropriate circumstances, to be determined by balancing the individual interest against countervailing State interests, particularly the State interest in the preservation of life. In striking that balance account is to be taken of the prognosis and of the magnitude of the proposed invasion. The same right is also extended to an incompetent person, to be exercised through a "substituted judgment" on his behalf. The decision should be that which would be made by the incompetent person, if he were competent, taking into account his actual interests and preferences and also his present and future incompetency.

The procedure to be followed in such cases, however, has been more controversial. It is reported that our *Saikewicz* decision was interpreted by some as requiring judicial approval before life-prolonging treatment could be withheld from an incompetent patient, even in cases of "brain death." See Annas, *supra* at 387. We therefore take this occasion to point out that neither the *Saikewicz* case nor the present case presented any issue as to the legal consequences of action taken without court approval. In the *Golston* case we held that "brain death," "in the opinion of a licensed physician, based on ordinary and accepted standards of medical

practice," was death. 373 Mass. at 252. There is no legal basis for a duty to administer medical treatment after death. See *Lovato* v. *District Court in and for the Tenth Judicial Dist.*, 198 Colo. 419 (1979). In the absence of a direction from the decedent, a surviving spouse or the next of kin have a "possession" of the body for burial. *Stackhouse* v. *Todisco*, 370 Mass. 860 (1976). See *Kelley* v. *Post Publishing Co.* 327 Mass. 275, 277 (1951). The *Dinnerstein* case did not involve "brain death," but a patient in an irreversible vegetative coma; the Appeals Court ordered entry of a judgment declaring that a medical order not to resuscitate the patient in the event of cardiac or respiratory arrest was not contrary to law and that the validity of such an order did not depend on prior court approval. Without approving all that is said in the opinion of the Appeals Court, we think the result reached on the facts shown in that case was consistent with our holding in the *Saikewicz* case.

In the *Saikewicz* case the patient was a profoundly retarded resident of a State school, and was incompetent to give informed consent to medical treatment. The superintendent of the school and a staff attorney filed a petition with the Probate Court for the appointment of a guardian with authority to make the necessary decisions. We held that the proceeding was properly initiated, and that the judge appropriately decided that the proposed chemotherapy should be withheld. We also indicated that, if the judge in such a case was not persuaded that the incompetent individual's choice, as determined by the "substituted judgment" standard, would have been to forgo potentially life-prolonging treatment, or if the interests of the State required it, the treatment was to be ordered. We approved the consideration of findings of medical ethics committees or panels, as well as the testimony of attending physicians and other medical experts, but we disapproved the delegation of the ultimate decision-making responsibility to any committee, panel or group, ad hoc or permanent. As applied to the situation there in issue, we reaffirm our decision and our reasoning.

The present case does not involve State action in the same sense as the *Saikewicz* case, since the patient here was not in State custody. While apparently competent, the patient had acquiesced in hemodialysis treatment, and had received such treatments for several months before his incompetence became apparent. His wife and son filed a petition for the appointment of a guardian and for an order that the treatments be discontinued. Again we hold that the proceeding was properly initiated, and that the judge appropriately decided that the treatments in question should be withheld. Again we disapprove shifting of the ultimate decision-making responsibility away from the duly established courts of proper jurisdiction.

In the present case, as in the *Saikewicz* case, there was no dispute as to the patient's lack of competence.[2] In each case the patient was clearly alive and conscious, and suffering from an incurably fatal disease. The treatments in question were intrusive and were life-prolonging rather than life-saving; there was no prospect of cure, or even of recovery of competence. In the *Saikewicz* case the life-prolonging treatment had not yet begun, and there was urgency with regard to taking action to begin treatment; in the present case the temporary continuation of treatment did not greatly change the situation. In each case the governing law and its application to the situation presented were in serious doubt. The appointment of guardians was almost a routine procedure, and we have no criticism of the decisions of the prospective guardians to seek explicit judicial authorization for the proposed course of treatment.

4. *The need for a court order.* Neither the present case nor the *Saikewicz* case involved the legality of action taken without judicial authority, and our opinions should not be taken to establish any requirement of prior judicial approval that would not otherwise exist. The cases and other materials we have cited suggest a variety of circumstances to be

---

[2] The question of competence was reopened after our order was entered. See note 1, *supra*.

taken into account in deciding whether there should be an application for a prior court order with respect to medical treatment of an incompetent patient. Among them are at least the following: the extent of impairment of the patient's mental faculties, whether the patient is in the custody of a State institution, the prognosis without the proposed treatment, the prognosis with the proposed treatment, the complexity, risk and novelty of the proposed treatment, its possible side effects, the patient's level of understanding and probable reaction, the urgency of decision, the consent of the patient, spouse, or guardian, the good faith of those who participate in the decision, the clarity of professional opinion as to what is good medical practice, the interests of third persons, and the administrative requirements of any institution involved. We are not called upon to decide what combination of circumstances makes prior court approval necessary or desirable, even on the facts of the case before us. Moreover, since the scientific underpinnings of medical practice and opinion are in a constant state of development, our opinion as to a particular set of facts may not be a reliable guide to the proper solution of a future medical problem. Nevertheless, we think it proper to review briefly the current legal situation.

Action taken without judicial approval might be the subject of either criminal or civil liability. Little need be said about criminal liability: there is precious little precedent, and what there is suggests that the doctor will be protected if he acts on a good faith judgment that is not grievously unreasonable by medical standards. See *Commonwealth* v. *Edelin*, 371 Mass. 497, 514-517 (1976), *id.* at 544 (dissenting opinion of Hennessey, C.J.). It is reported that apparently no prosecutor has proceeded to trial in a case where a physician chose to terminate life-preserving treatment or omit emergency treatment in a hopeless case. See Collester, Death, Dying and the Law: A Prosecutorial View of the *Quinlan* Case, 30 Rutgers L. Rev. 304, 310-311 (1977).

The law governing civil liability has been more fully developed. See G. L. c. 111, § 70E; Sharp & Crofts, Death

with Dignity — The Physician's Civil Liability, 27 Baylor L. Rev. 86 (1975); Note; Statutory Recognition of the Right to Die: The California Natural Death Act, 57 B.U.L. Rev. 148, 149-157 (1977). Unless there is an emergency or an overriding State interest, medical treatment of a competent patient without his consent is said to be a battery, but there is serious question whether it is useful to think about medical treatment of incompetent patients in terms of battery. See *Rogers* v. *Okin*, 478 F. Supp. 1342, 1383-1384 (D. Mass. 1979). As to an emergency, see *id.* at 1364-1365; *Denny* v. *Tyler*, 3 Allen 225, 227-229 (1861); G. L. c. 112, §§ 12B, 12F. We have treated the consent of a parent as the equivalent of consent for his minor child. *Reddington* v. *Clayman*, 334 Mass. 244, 246-247 (1956). See *Baird* v. *Attorney Gen.*, 371 Mass. 741, 753-754 (1977); cf. G. L. c. 111, § 117; c. 112, §§ 12E, 12F. In *Belger* v. *Arnot*, 344 Mass. 679, 686-687 (1962), we treated the consent of the husband of an insane patient as the equivalent of her consent, but only if there was danger of harm to her or to others. In the absence of consent or its equivalent, it has been common practice to seek the appointment of a guardian for an incompetent patient; we seem to have no binding precedent as to liability for medical treatment of an incompetent patient who has no parent, spouse or guardian, nor as to the extent of the authority of a guardian in the absence of an explicit grant by the court. There is responsible opinion, however, that a duly appointed guardian of the person may give effective consent for the ward to undergo whatever medical treatment the guardian believes will be in the ward's best interest. See Rep. A.G., Pub. Doc. No. 12, at 247-248 (1966); *Rogers* v. *Okin*, 478 F. Supp. 1342, 1362-1364 (D. Mass. 1979). Under the "substituted judgment" doctrine of the *Saikewicz* case, however, the guardian, like the court, must seek to identify and effectuate the actual values and preferences of the ward. See *Custody of a Minor (No. 3)*, 378 Mass. 732, 745 (1979).

Withholding of treatment does not fit neatly into the category of battery. A physician who has undertaken to render

medical services violates his duty of care if he abandons his patient or fails to take steps called for by good medical practice. See W. Prosser, Torts § 56 (4th ed. 1971). Whenever a physician in good faith decides that a particular treatment is not called for, there is a risk that in some subsequent litigation the omission will be found to have been negligent. But the standard for determining whether the treatment was called for is the same after the event as before; negligence cannot be based solely on failure to obtain prior court approval, if the approval would have been given. Consent of the patient may not always immunize the physician from a charge of negligence. *King* v. *Solomon*, 323 Mass. 326 (1948) (inappropriate drug treatment). Immunity afforded by court authorization would seem to be subject to similar limitation, for example, if the physician is negligent in implementing the court order. Thus absence of court approval does not result in automatic civil liability for withholding treatment; court approval may serve the useful purpose of resolving a doubtful or diputed question of law or fact, but it does not eliminate all risk of liability.

What, then, is the significance of our disapproval of a shift of ultimate responsibility away from the courts? We in no way disapprove the practice of committee review of decisions by members of a hospital staff. But private medical decisions must be made responsibly, subject to judicial scrutiny if good faith or due care is brought into question in subsequent litigation, although the concurrence of qualified consultants may be highly persuasive on issues of good faith and good medical practice. This is true of medical decisions generally, and is no less true of a decision to withhold medical treatment from an incompetent patient. When a court is properly presented with the legal question, whether treatment may be withheld, it must decide that question and not delegate it to some private person or group. Subsidiary questions as to how to carry out the decision, particularly purely medical questions, must almost inevitably be left to private decision, but with no immunity for action taken in bad faith or action that is grievously unreasonable.

5. *The decision to withhold treatment.* We have pointed out the similarities between the present case and the *Saikewicz* case, which are quite sufficient to bring into play the "substituted judgment" standard applied in that case. Thus the judge's finding that the ward "would, if competent, choose not to receive the life prolonging treatment" was critical. An expression of intent by the ward while competent was not essential. The judge properly relied in part on the opinion of the ward's wife of fifty-five years. That opinion was corroborated by that of the son, and there was every indication that there was a close relationship within the family group, that the wife and son had only the best interests of the ward at heart, and that they were best informed as to his likely attitude. There was no evidence that financial considerations were involved.[3]

The medical testimony was consistent with the critical finding. The testimony concerning the magnitude of the invasion occasioned by hemodialysis was similar to that in *Commissioner of Correction* v. *Myers*, 379 Mass. 255, 263 (1979); it was unlike "the relatively simple and risk-free treatments of supportive oral or intravenous medications." In the *Myers* case the prognosis was far more positive. When the treatments began in the present case, there was hope that the ward's mental condition would improve. Instead, it became much worse. He could not understand the need for the treatments and the accompanying discomfort; he was uncooperative and had to be heavily sedated. Hence we agree with the Appeals Court that the critical finding was not clearly erroneous. The problem of impairment of "quality of life" associated with Saikewicz's mental retardation has no analogue in the present case.

The balance between the putative desire of the ward and the possible countervailing State interests was much like

---

[3] After our order was entered, the ward's wife testified that after the original hearing financial concern arose from the cost of the nursing home, and that she did not know whether removal of that concern would change her opinion about what the ward would want. It seems clear that financial concern might influence the decision of a competent patient, but it also might impair the reliability of the opinion of the wife.

that in the *Saikewicz* case. There was no question of protecting third parties, preventing suicide, or maintaining the ethical integrity of the medical profession. As for the State's interest in the preservation of life, we said in the *Myers* case that "the defendant's interest in refusing dialysis" was "strong enough, despite the positive prognosis, to counterbalance the State's usually predominant interest in the preservation of life." 379 Mass. at 266. In the present case there was no positive prognosis.

6. *Revision of findings.* Thus the judge's findings were not clearly erroneous and the judge's May 15 order was in accordance with law. In an ordinary civil action that would be the end of the matter, and there would be no occasion to suggest to the judge that his findings could be revised. But this was not an ordinary civil action; it presented an issue of life and death in an ongoing situation. Nine months had elapsed between the evidentiary hearing and the entry of our order, and the ward's lack of competence had been conceded rather than litigated. The possibility seemed remote that the ward might regain competence, experience lucid intervals, or even be able to express a "sensible opinion" as to his desire. See *Doe* v. *Doe*, 377 Mass. 272, 278-279 (1979). But even a possibility of some change of circumstances might warrant reconsideration. Accordingly, we "emphasized" the possibility of a further order.

Nevertheless, we recognize that there are serious costs attendant upon lack of finality. The principal objection to a practice of seeking prior court approval for a decision to withhold treatment is that "it would be impossibly cumbersome." *In re Quinlan*, 70 N.J. 10, 50 (1976). In the present case the ward died more than a year after the petition was filed, and the issue was still unresolved. The ward himself was doubtless unaware of the numerous appraisals and reappraisals of his situation, but a fearful strain was imposed upon others concerned.

Without criticizing anyone for the course of these proceedings, we stress the desirability of expediting such cases. In particular, the guardian ad litem diligently carried out his

"responsibility of presenting to the judge, after *as thorough an investigation as time will permit*, all reasonable arguments in favor of administering treatment to prolong the life of the individual involved," in accordance with the *Saikewicz* opinion. 373 Mass. at 757 (emphasis supplied). In view of the state of the law, he was justified in seeking appellate review. But we impose no duty to present arguments the guardian ad litem does not believe meritorious and no obligation to take appeals as a matter of course.

We think it proper to point out that a probate judge can act with dispatch on an application for appointment of a temporary guardian. G. L. c. 201, § 14. Rule 29B of the Probate Courts (1975). Unless there is an emergency, it is often desirable to appoint a guardian ad litem and to allow him a reasonable time to investigate and report. See *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 757 (1977). The probate judge may expedite the subsequent hearing,[4] and may report the case to the Appeals Court or may report a question arising on an interlocutory order. G. L. c. 215, § 13. Mass. R. A. P. 5, as appearing in 378 Mass. 924 (1979). Time limits may be shortened by a single justice of the Appeals Court. Mass. R. A. P. 2, 365 Mass. 845 (1974). If there are substantial reasons affecting the public interest or the interests of justice, a joint application for direct appellate review by this court may be appropriate. G. L. c. 211A, § 10. Mass. R. A. P. 11 (a), as appearing in 378 Mass. 924 (1979). If other remedies fail, an application may be made to a single justice of this court to exercise our power of general superintendence. G. L. c. 211, § 3. In short, expedited decision can be obtained when appropriate. See *Baird* v. *Attorney Gen.*, 371 Mass. 741, 756-758 (1977).

---

[4] Apparently part of the delay in the present case resulted from the serious illness of the ward's wife.