KATHERINE RUDOW *vs.* COMMISSIONER OF THE DIVISION OF
MEDICAL ASSISTANCE[1] (and a companion case[2]).

Barnstable. December 7, 1998. - March 11, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Medicaid. Health Care Facility. Administrative Law,* Judicial review, Agency's
interpretation of statute. *Incompetent Person,* Consent to medical treat-
ment. *Mental Health. Guardian,* Consent to medical treatment, Incompetent
person.

Two incompetent persons who, without court-appointed guardians, would not
have been able to obtain necessary and appropriate medical treatment,
were entitled to deduct from their income, for purposes of determining the
Medicaid "patient paid amount," the reasonable judicially-approved
expenses of the guardians, where such expenses were "necessary . . .
medical or remedial care" expenses recognized under Massachusetts law;
in the circumstances, the decision of the Division of Medical Assistance to
the contrary was in conflict with the controlling Federal statutory schemes,
based on an error of law, and not in accordance with law. [223-230]

CIVIL ACTIONS commenced in the Superior Court Department
on April 21 and 30, 1993, respectively.

The cases were heard by *Richard F. Connon,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Beth E. Waldman* for the defendant.

*John J. Ford (Martha T. Ramsey* with him) for the plaintiffs.

*Kenneth A. Behar, John D. Stuebing & Rochelle H. Zapol,* for
Massachusetts Extended Care Federation, Inc., amicus curiae,
submitted a brief.

---

[1] The actions originally were filed against the Commissioner of Public
Welfare. On June 2, 1997, the Commissioner of the Division of Medical As-
sistance was substituted as the real party in interest. The Division of Medical
Assistance is the Massachusetts regulatory agency responsible for administer-
ing the Medicaid program. G. L. c. 118E. See *Cohen* v. *Commissioner of the
Div. of Medical Assistance,* 423 Mass. 399, 399 n.3 (1996), cert. denied sub
nom. *Kokoska* v. *Bullen,* 519 U.S. 1057 (1997).

[2] Mary L. Perry *vs.* Commissioner of the Division of Medical Assistance.

MARSHALL, J. We are asked once again to decide whether the Division of Medical Assistance (division) has correctly interpreted provisions of Title XIX of the Social Security Act (1965), the Medicaid Act, 42 U.S.C. §§ 1396 et seq., and its implementing Federal and State regulations, in calculating how much an institutionalized Medicaid recipient must contribute to the cost of her long-term care (the "patient paid amount" or PPA).[3] Cf. *Tarin* v. *Commissioner of the Div. of Medical Assistance*, 424 Mass. 743 (1997). At issue in this case is whether, in calculating her "patient paid amount," a nursing home resident who has been adjudicated incompetent and for whom a legal guardian has been appointed, may deduct from her monthly income judicially approved guardianship expenses (attorney's fees and costs) as an allowance for "necessary . . . medical or remedial care recognized under state law." 130 Code Mass. Regs. § 506.220(E)(2)(a) (1993).[4] See 42 U.S.C. § 1396a(r)(1)(A)(i) (1994); 42 C.F.R. § 435.725(c)(4)(ii). The fees were incurred in connection with a physician-certified guardianship proceeding, a prerequisite to the Massachusetts resident gaining access to the long-term care facility suitable to provide the medical and related care services she needed, and to implementing an appropriate physician-approved treatment plan for her.

I

Katherine Rudow, an elderly woman, was faced with eviction from the nursing home in which she resided because she lacked the mental capacity to pay her bill or to apply for Medicaid.

---

[3]Institutionalized Medicaid recipients are required to contribute virtually all their monthly income toward the cost of their care before Medicaid commences payment on their behalf. The "patient paid amount," the recipient's financial responsibility, is a recipient's monthly income, less any deductions for authorized "allowances" — for example, a "personal needs allowance" or an allowance to pay premiums for Medicare supplemental health insurance. 130 Code Mass. Regs. § 506.220(A), (E). See 42 C.F.R. § 435.832(c)(2)(i). "Gross [i]ncome" is defined as "the total money earned or unearned, such as wages, salaries, rents, pensions, or interest, received from any source without regard to deductions." 130 Code Mass. Regs. § 501.001 (1994).

[4]We refer in this opinion to the regulations cited by the parties in effect at the time of the dispute. The current regulations pertaining to institutionalized persons are set out at 130 Code Mass. Regs. §§ 515.000 — 523.000. 130 Code Mass. Regs. § 515.002.

The nursing home notified Rudow and her family that she would be discharged. Rudow's medical condition required that she reside in a skilled nursing facility. Her physician certified that she was not mentally capable of consenting to medical care. On February 25, 1992, a judge in the Probate Court adjudicated Rudow to be incompetent and in need of a guardian. Attorney Martha T. Ramsey was appointed as her guardian. G. L. c. 201, § 6. Subsequently, a judge in the Probate Court ordered that Ramsey's fees be paid from Rudow's income.[5] G. L. c. 201, § 16. Ramsey notified the division of the order and requested authorization to deduct guardianship expenses from Rudow's income in calculating Rudow's PPA. The division denied the request.

The physician of Mary L. Perry, ninety-five years old at the time this action commenced in 1993, and hospitalized as a patient at Cape Cod Hospital in Hyannis, determined she required care in a long-term care facility. She was not, however, mentally capable of consenting to her discharge from the hospital, or of signing an admission contract at a long-term care facility. In addition she was mentally incapable of completing an application for Medicaid benefits essential to pay for her care.[6] To obtain the medical care her physician ordered, it was necessary to appoint a guardian for Perry, and her physician so certified. On November 15, 1991, a judge in the Probate Court adjudicated Perry to be incompetent, and appointed her niece, Eileen Lopez, as her guardian. G. L. c. 201, § 6. Lopez, who lives in New York, retained Ramsey to represent Lopez and Perry in guardianship matters. Lopez did not seek payment of guardianship expenses for herself; she obtained an order from a judge in the Probate Court that Ramsey's fees be paid from Per-

---

[5]Rudow claims that the judge approved payment of attorney's fees to Ramsey for ten hours at a rate of sixty-five dollars per hour prior to the appointment of a guardian; ten hours at a rate of fifty dollars per hour to secure Medicaid coverage to pay for necessary medical care; and two hours each month thereafter at a rate of fifty dollars per hour. G. L. c. 201, § 16. The division does not suggest otherwise. The judge also ordered that Ramsey report the time spent on Rudow's legal affairs on Ramsey's annual fiduciary accounts. Ramsey will need to establish any deductions for guardianship expenses she makes on Rudow's behalf in calculating Rudow's PPA.

[6]In his memorandum and order dated May 31, 1996, the judge in the Superior Court described Rudow and Perry as "demented residents of nursing homes."

ry's income.[7] G. L. c. 201, § 16. Ramsey notified the division of the order and requested authorization to deduct guardianship expenses from Perry's income in calculating Perry's PPA. The division denied the request.

Rudow and Perry appealed, and administrative "fair hearings" were held on January 8, 1993. In each case the welfare appeals referee concluded "that the attorney deserves to be paid for providing her services," but that a deduction from the income of the Medicaid recipient for those services was not allowable. Citing 130 Code Mass. Regs. § 506.220, the referee concluded that payment of the guardianship expenses should be made from the "personal needs allowance" (PNA) — sixty dollars a month — available to Rudow and Perry. 130 Code Mass. Regs. §§ 506.220(A)(1), 506.420.[8] Rudow and Perry sought judicial review pursuant to G. L. c. 30A, § 14, on April 21 and April 30, 1993, respectively. Their cases were consolidated. On May 31, 1996, a judge in the Superior Court concluded that the division's decision was erroneous. He ruled that the guardianship costs "must be considered medical or remedial and, subject to reasonable limits, must be allowed as a deduction from the plaintiff[s'] income to determine their PPAs." The judge remanded the case to the division's board of hearings for further proceedings. Final judgment entered for Rudow and Perry on March 20, 1997. On May 7, 1997, the division took an appeal. We transferred the cases here on our own motion. We affirm the judgment of the Superior Court.

## II

Medicaid provides medical assistance to low income persons

[7]The judge approved payment of attorney's fees to Ramsey for ten hours at a rate of sixty-five dollars per hour prior to the appointment of a guardian; and two hours each month thereafter at the same rate. G. L. c. 201, § 16. The judge also ordered that Ramsey report the time spent on Perry's legal affairs on Ramsey's annual fiduciary accounts.

[8]A "personal needs allowance" is one of the permitted allowances that a long-term care Medicaid recipient may deduct from her income. The amount of the PNA "shall be the Division's current institutional income standard for one person as specified in 130 [Code Mass. Regs.] § 506.420." 130 Code Mass. Regs. § 506.220(A)(1). Title 130 Code Mass. Regs. § 506.420, in turn, specifies that in long-term care cases the "income standard" is sixty dollars each month. See 42 C.F.R. § 435.832(c)(1) (defining "personal needs allowance" as an "allowance that is reasonable in amount for clothing and other personal needs of the individual while in the institution").

based on financial need. See *Tarin* v. *Commissioner of the Div. of Medical Assistance,* 424 Mass. 743, 746 (1997); *Massachusetts Hosp. Ass'n* v. *Department of Pub. Welfare,* 419 Mass. 644, 646 (1995). State participation in this public assistance program is voluntary, and those that choose to participate must submit, for Federal approval, a State Medicaid plan that complies with the Medicaid Act and its implementing regulations. 42 U.S.C. §§ 1396 et seq. In Massachusetts, long-term care services are available to persons eligible for Medicaid, and the costs of institutionalization are met by payments to the facility by the Medicaid recipient (where available) and by Medicaid. See 42 C.F.R. § 435.832(a). The division establishes the amount that the recipient is required to contribute, see note 3, *supra,* and the concomitant amount that Medicaid will pay on her behalf.

In conformity with Federal requirements, 130 Code Mass. Regs. § 506.220 specifies the allowances that a long-term care Medicaid recipient may deduct from her income in calculating her PPA: (a) personal needs allowance; (b) spousal maintenance needs allowance; (c) a family maintenance needs allowance for qualified family members; (d) a home maintenance allowance; and (e) health-care coverage and incurred expenses. See 42 U.S.C. § 1396a(q), (r); 42 C.F.R. § 435.832(c). This dispute concerns the allowance for "health-care coverage and other incurred expenses." "Incurred expenses," in turn, are defined as those expenses that a Medicaid recipient incurred "for necessary medical and remedial care" that are not payable by a third party. 42 U.S.C. § 1396a(r)(1)(A). The "necessary medical and remedial care" expenses include "medical or remedial care recognized under state law but not covered by the Medical Assistance Program." 130 Code Mass. Regs. § 506.220(E)(2)(a). See 42 U.S.C. § 1396a(r)(1)(A)(ii). The question for decision is whether, as guardian for Rudow and Perry, Ramsey's court-sanctioned fees constitute "necessary . . . medical or remedial care recognized under state law." 130 Code Mass. Regs. § 506.220(E)(2)(a).

The judge in the Superior Court answered the question affirmatively. Observing that Rudow's and Perry's guardianship proceedings "were initiated for no other reason than to obtain medical treatment for the plaintiffs at a long-term care facility," he concluded that in the circumstances presented by these two Medicaid recipients, Ramsey's fees are allowable deductions.

130 Code Mass. Regs. § 506.220(E). He reasoned that "the costs of guardianship must be characterized as 'necessary medical expenses' when they are required under the doctrine of informed consent and when needed to furnish medical treatment to a demented nursing home resident. . . . When legal fees and costs associated with guardianship are necessary in order to authorize any medical treatment for an incompetent person under Massachusetts law, they are medical expenses, and as such are properly deductible from the income of an institutionalized Medicaid recipient pursuant to [division] regulations at 130 [Code Mass. Regs.] 506.220."

## III

We review the decision of an administrative agency under G. L. c. 30A, § 14, to determine whether "the substantial rights of any party may have been prejudiced because the agency decision is . . . (*c*) [b]ased on an error of law" or "(*g*) [a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." G. L. c. 30A, § 14 (7). See *Tarin v. Commissioner of the Div. of Medical Assistance, supra* at 750. In doing so, we "give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." § 14 (7). We are not, however, bound to adhere to a position taken by the agency particularly where, as here, there are neither Federal nor State regulations directly addressing the issue. See *Haley v. Commissioner of Pub. Welfare*, 394 Mass. 466, 473-474, 476 (1985). "Absent a properly promulgated regulation, 'to the extent that an agency determination involves a question of law, it is subject to de novo judicial review.' " *Id.* at 476, quoting *Raytheon Co. v. Director of the Div. of Employment Sec.*, 364 Mass. 593, 595 (1974).

The doctrine of "informed consent" — the requirement that a medical provider obtain the consent of a fully informed patient before administering treatment to that patient — has long been part of Massachusetts law. See, e.g., *Harnish v. Children's Hosp. Medical Ctr.*, 387 Mass. 152, 154 (1982), citing *Superintendent of Belchertown State Sch. v. Saikewicz*, 373 Mass. 728, 738-739 (1977); *Matter of Spring*, 380 Mass. 629, 634, 637-638 (1980). Only a competent person may give informed consent for medical care. See *Harnish v. Children's Hosp. Medical Ctr., supra* at 154-155. For this reason Mas-

sachusetts law also has long recognized that, where a patient's cognitive impairments call into question her ability to make treatment decisions, medical treatment may not be administered without adequate and judicially supervised protection. See G. L. c. 201, § 6.[9] See also *Matter of Spring, supra* at 638 ("a duly appointed guardian of the person may give effective consent for the ward to undergo whatever medical treatment the guardian believes will be in the ward's best interest," citing Rep. A.G., Pub. Doc. No. 12, at 247-248 [1966]; *Rogers* v. *Okin*, 478 F. Supp. 1342, 1362-1364 [D. Mass. 1979]). In *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489 (1983), we held that, whenever a medical provider seeks to administer antipsychotic medication to a patient who is incapable of consenting to medical treatment, judicial protection of the patient's rights is mandated. A judge must first determine whether the patient is incompetent. *Id.* at 498. If so, a judge then decides, " 'that which would be made by the incompetent person, if that person were competent' . . . and giving 'the fullest possible expression to the character and circumstances of that individual.' " *Id.* at 500, quoting *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra* at 752-753, 747. A guardian thereafter monitors the patient's treatment "to ensure that the substituted-judgment treatment plan is followed." *Rogers* v. *Commissioner of the Dep't of Mental Health, supra* at 504. The requirement that a guardian be appointed to act on behalf of an incompetent person who requires necessary medical treatment is

---

[9]The division suggests that G. L. c. 201, § 6, concerning the appointment of guardians of "mentally ill" persons may not be applicable to this case. Paragraph (*a*) of that section requires a judge to appoint a guardian of a person and her estate "if, after notice . . . and a hearing, the court finds that [she] is incapable of taking care of [herself] by reason of mental illness." The division says there is nothing in the record to indicate that Rudow and Perry are "mentally ill." The claim is extraordinary. On November 15, 1991, a judge in the Probate Court appointed a guardian for Perry on a petition under G. L. c. 201, § 6 ("guardianship mentally ill"). On February 25, 1992, a judge in the Probate Court approved a similar "guardianship mentally ill" petition for Rudow. In *Fazio* v. *Fazio*, 375 Mass. 394, 403 (1978) we thought "it reasonable to interpret the statutory phrase 'incapable of taking care of himself by reason of mental illness,' as encompassing a general inability on the part of an individual to manage his own person and financial affairs, such inability being caused by mental illness. We think the type of evidence necessary to support such a finding, apart from evidence as to mental illness, should consist of facts showing a proposed ward's inability to think or act for himself as to matters concerning his personal health, safety, and general welfare, or to make informed decisions as to his property or financial interests."

therefore an integral part of the law in Massachusetts concerning medical treatment for incompetent patients. G. L. c. 201, § 6. See *Guardianship of Weedon,* 409 Mass. 196, 202 (1991); *Rogers* v. *Commissioner of the Dep't of Mental Health, supra* at 504; *Matter of Spring, supra* at 638; *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra* at 739-740.

While our decision in *Rogers* concerned the rights of involuntarily committed mental patients, it rested on our recognition that all patients have a fundamental right to participate in treatment decisions and that where they are incompetent to do so, that is where they are "incapable of taking care of [themselves] by reason of mental illness," G. L. c. 201, § 6, a guardian may be appointed to protect those rights. In *Rogers,* we specifically rejected the argument that a patient's physician "should be responsible for making treatment decisions for involuntarily committed patients, whether competent or not." *Rogers* v. *Commissioner of the Dep't of Mental Health, supra* at 497. The inability of incompetent long-term care patients to pay for guardians may interfere not only with medical treatment but with access to an appropriate medical facility. Indeed, Perry was unable to be transferred to an appropriate medical facility without her consent. Where patients — like Rudow and Perry — are incapable of making their own treatment decisions, court intervention is mandated. *Id.* at 501. See *Matter of Spring, supra* at 637-638.

In the intervening years since *Rogers,* guardians increasingly have played a significant role in the care and treatment of those patients. The Massachusetts doctrines of informed consent, *Harnish* v. *Children's Hosp. Medical Ctr., supra* at 154-155, and substituted judgment, *Rogers* v. *Commissioner of the Dep't of Mental Health, supra* at 504, did not, of course, develop in the context of an aging population requiring long-term institutionalized care. The vulnerability of that population is now recognized, and both Federal and State law have recognized the need for special legal protections, primarily by regulatory oversight of long-term care nursing facilities. See Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, §§ 4201-4206, 4211-4218, 101 Stat. 1330-160 (OBRA 1987); 42 U.S.C. § 1395i-3 (Medicare) & § 1396r (Medicaid).

Federal regulations implementing OBRA require that "[i]n the case of a resident adjudged incompetent under the laws of a State by a court of competent jurisdiction, the rights of the

resident are exercised by the person appointed under State law to act on the resident's behalf." 42 C.F.R. § 483.10(a)(3). Those rights are extensive. OBRA regulations, for example, require the participation by an incompetent patient's legal representative in all treatment decisions. See, e.g., 42 C.F.R. § 483.20(d)(2)(ii) (patient assessments by interdisciplinary team must involve "participation of the resident, the resident's family or the resident's legal representative"). The Massachusetts Attorney General similarly has promulgated regulations that require a long-term care resident's legal representative to participate in the care, treatment planning, and decision making where a resident has been adjudicated incompetent.[10] 940 Code Mass. Regs. § 4.08(3). See 940 Code Mass. Regs. § 4.08(13) (notice to incompetent patient's legal representative regarding significant changes in resident's condition); 940 Code Mass. Regs. § 4.09(6) (same regarding transfer and discharge issues).

For both Rudow and Perry, a physician certified that they were incompetent to consent to medical treatment. Without a court-appointed guardian, neither patient would have been able to obtain necessary and appropriate medical treatment. Their guardians also achieved a more efficient delivery of medical care. In these circumstances, the expenses incurred by guardians are "necessary . . . medical or remedial care" expenses "recognized under state law."[11] 130 Code Mass. Regs.

[10]The Attorney General promulgated 940 Code Mass. Regs. §§ 4.00 et seq. ("Attorney General's regulations") pursuant to his authority under G. L. c. 93A, § 2 (c). The regulations define certain unfair or deceptive acts or practices, and are "designed to promote the protection, comfort, health and well-being of consumers of services provided by long-term care facilities, to be consistent with existing legal standards, and to be as responsive as possible to the constraints and administrative realities under which long term care facilities operate." 940 Code Mass. Regs. § 4.00.

[11]The same result is achieved in a different Medicaid context. If, after taking the allowable income deductions, a patient's monthly income is still too high to qualify her for Medicaid, the division will establish a six-month deductible. 130 Code Mass. Regs. §§ 520.026-520.028. If an applicant meets this deductible, she then will be eligible for Medicaid. 130 Code Mass. Regs. § 520.034. Title 130 Code Mass. Regs. § 520.031(A)(2) describes "allowable . . . remedial care-expense[s]" for the purpose of meeting the long-term care deductible. The regulation states, in relevant part: "A remedial-care expense is a nonmedical support service made necessary by the medical condition of the individual or the spouse." Id. Guardianship is a nonmedical support service, made necessary by the mental incapacity of the Medicaid recipient to consent

§ 506.220(E)(2)(a).[12]

The division's resistance to this interpretation warrants comment.[13] It insists that treating medically required guardianship expenses as a permissible allowance ("incurred expense") conflicts with the Health Care Financing Administration's (HCFA's) policy interpretation of the cognate Federal statute and implementing regulations.[14] It complains that, in reviewing the division's denials of the deductions, the judge did not give appropriate deference to HCFA. HCFA has not promulgated regulations specifically addressing the issue. The division points to correspondence between the Attorney General for the Commonwealth and HCFA,[15] and to HCFA's refusal in 1987 to ap-

---

to medical care. See *id.* We see no reason why we should consider any differently the definition of remedial care expenses for the purpose of meeting the long-term care deductible than we do for considering an income deduction.

[12]The judge in the Superior Court also concluded, correctly, that the guardianship expenses were "not payable by a third party," 130 Code Mass. Regs. § 506.220(E)(2)(a), and "not covered by the Medical Assistance Program." *Id.* He also concluded that the expenses satisfied the reasonable limits set forth in 130 Code Mass. Regs. § 506.220(E)(2)(b) because they are "(i) not already covered by the Medicaid per diem rate paid to the long-term-care facility; and (ii) certified by a treating physician or other medical provider as being medically necessary."

[13]The division, apparently, has not been consistent in its interpretation of 130 Code Mass. Regs. § 506.220(E)(2), as it pertains to guardian fees and costs for incompetent patients of long-term care nursing facilities, and previously has allowed those fees and costs as "incurred expenses" within the meaning of that regulation.

[14]The Health Care Financing Administration (HCFA), a subsidiary of the United States Department of Health and Human Services, is the Federal agency charged with administering the Medicaid program and promulgating its implementing regulations. *Visiting Nurse Ass'n of the N. Shore, Inc.* v. *Bullen,* 93 F.3d 997, 999 n.1 (1st Cir. 1996), cert. denied, 519 U.S. 1114 (1997), citing *Elizabeth Blackwell Health Ctr. for Women* v. *Knoll,* 61 F.3d 170, 174 (3d Cir. 1995), cert. denied, 516 U.S. 1093 (1997).

[15]In July, 1997, the Attorney General for the Commonwealth urged HCFA to interpret allowable deductions from a Medicaid recipient's income for "necessary medical and remedial care" to include guardianship expenses for incompetent long-term care patients such as Rudow and Perry. HCFA responded that "[a]lthough various medical evaluations, certifications, and data are required as part of the process of appointing a *Rogers* [v. *Commissioner of the Dep't of Mental Health,* 390 Mass. 489 (1983)] guardian, appointment of a guardian is nevertheless a legal proceeding. . . . [G]uardianship costs do not in any way meet the definition of medical and remedial care, and thus cannot be deducted from the individual's income under that category."

prove an amendment to the Missouri State Medicaid plan,[16] as indicative of HCFA's interpretation of applicable Federal law. While the division must comply with regulations promulgated by HCFA, G. L. c. 118E, § 9, HCFA's policy in the absence of a regulation is not compelling. "Although 'an administrative interpretation of a statute is accorded deference,' *Rock* v. *Massachusetts Comm'n Against Discrimination*, 384 Mass. 198, 204 (1981), quoting *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112, 116 (1978), interpretative rule making is not controlling upon the courts, *Daughters of Miriam Center for the Aged* v. *Mathews*, 590 F.2d 1250, 1258 (3d Cir. 1978)." *Haley* v. *Commissioner of Pub. Welfare, supra* at 473. HCFA's denial of the Missouri State plan proposed amendment and the letter to the Attorney General of the Commonwealth at best "are simply interpretive rules." *Id.*, quoting *Colorado Dep't of Social Servs.* v. *Department of Health & Human Servs.*, 558 F. Supp. 337, 352 (D. Colo. 1983). We do not consider ourselves bound by HCFA's policy position particularly where, as here, we conclude that position conflicts with the controlling Federal statutory scheme.

We also are not persuaded that the appropriate resolution of this issue is legislative rather than judicial. The division suggests that the Commonwealth could enact legislation increasing the personal needs allowance (PNA) for Medicaid recipients who require court-appointed guardians to obtain necessary medical treatment. The PNA is to allow long-term care residents to retain a modest amount of income for small items of a truly

[16]In 1987, HCFA rejected an attempt by Missouri to amend its State plan to reduce its payments to long-term care institutions by permitting the deduction from an individual's income of "guardianship-related services." Interpreting 42 C.F.R. 435.733(c)(4)(ii), HCFA concluded that guardianship-related services were not "necessary medical or remedial care recognized under State law" because "[t]he services of a guardian are plainly legal or administrative even though they may be quite important to necessary medical care." While we are not bound by that determination, two observations are relevant. First, in support of its position HCFA observed that "[g]uardianship services do not require medical expertise and do not serve medical purposes in the sense that the administration of pharmaceuticals or surgery do." In Massachusetts, of course, medical expertise is a necessary prerequisite for the appointment of a guardian pursuant to G. L. c. 201, § 6. Second, HCFA suggested that for "tax purposes" guardianship-related items would not be included in the "broad category of deductible medical expenses" recognized under the law of Federal taxation. The law is to the contrary. See, e.g., *Gerstacker* v. *Commissioner of Revenue*, 414 F.2d 448 (6th Cir. 1969); Rev. Rul. 71-281, 1971-2 C.B. 165.

personal nature. The PNA must be "reasonable in amount for clothing and other personal needs of the individual (or couple) while in an institution." 42 U.S.C. § 1396a(q)(1)(A)(i). Federal law requires the PNA to be not less than, although it may be more than, thirty dollars per month for an institutionalized individual and sixty dollars per month for an institutionalized couple. 42 U.S.C. § 1396a(q). The contemporaneous House Conference Committee Report states that the PNA was "intended to cover the cost of personal needs, such as toiletries and other small items, that are not covered by Medicaid." H.R. Conf. Rep. No. 100-495, 100th Cong., 1st Sess. 834, reprinted in 1987 U.S.C.C.A.N. 2313-1580. The Secretary's understanding of the items and services that may be charged to a resident's PNA are set out in the margin.[17] The items are not analogous to guardianship expenses necessitated by the incapacity of a nursing home resident to consent to her own medically necessary treatment.

Corresponding Massachusetts legislation exhibits the same legislative intent concerning the PNA. General Laws c. 118E, § 15, provides that a Medicaid recipient "shall retain the first sixty dollars of monthly income for clothing, personal needs allowance, and leisure time activities." The legislation does not contemplate the payment of medically necessary guardianship expenses as part of a Medicaid recipient's personal needs allowance.[18]

## IV

The division's denial of the request by Rudow and Perry to

---

[17]Title 42 C.F.R. § 483.10(c)(8)(ii) provides that the PNA may be used for telephone; television or radio for personal use; smoking materials, notions, and novelties; confections; cosmetics and grooming items; personal clothing; personal reading matter; gifts purchased on behalf of a resident; flowers and plants; social events and entertainment; privately hired nurses or aides; private room, except when therapeutically required; and specially prepared or alternative food requested.

[18]The Rhode Island Department of Human Services has promulgated regulations that permit institutionalized Medicaid recipients who incur legal and guardianship expenses "in order to make income or resources available for their support," and who have "court-appointed guardians or conservators" to take an allowance in addition to the basic personal needs deduction. 3 R.I. Dep't Human Servs. Manual §§ 0392.15.15 & 0392.15.15.05 (1995). We see nothing in G. L. c. 118E, § 15, that would prevent the division from promulgating a similar regulation permitting a similar deduction for legal, guardianship, and conservator fees.

recognize their guardianship costs as "necessary medical and remedial care" expenses deductible for purposes of calculating their PPA is "[b]ased upon an error of law" and "not in accordance with law." G. L. c. 30A, § 14 (7) (*c*), (*g*). The guardianship expenses of all Medicaid recipients do not automatically constitute "incurred expenses." 130 Code Mass. Regs. § 506.220(E)(2). Deductions from a recipient's income are mandated only in circumstances where a guardian is essential for an incompetent Medicaid recipient to gain access to or consent to medical treatment. The division may set reasonable limits on such expenses in conformity with 130 Code Mass. Regs. § 506.220(E)(2)(b).

*Judgment affirmed.*