Ricclardone, David, J.
The plaintiff, Carole McRell (“McRell”), brings this suit against defendants, Central Phlebotomy Services, Inc. (“CPS") and Richard Haas, M.D. (“Haas”) claiming negligence (Count I) and battery (Count II) against CPS, as well as negligence (Count III) and battery (Count IV) against Haas. McRell alleges that a phlebotomist employed by CPS injured her during a routine blood draw. She further contends that the phlebotomist was Haas’s agent. Haas argues that the phlebotomist had no actual or apparent authority to act as his agent. This matter is now before the court on Haas’s motion for summary judgment on Counts III and IV. For the reasons set forth below, the defendant’s motion for summaiy judgment is ALLOWED in part and DENIED in part.
Background
The following facts are gleaned from the parties’ Joint Statement of Undisputed Facts and the summary judgment record.
Haas is an endocrinologist operating a sole proprietorship medical practice at 200 Lincoln Street in Worcester, Massachusetts. He shares an office suite with two other physicians. Four other medical providers practice in the same building.
CPS is a corporation that performs blood draws for medical providers. John Byrne (“Byrne”) serves as its president, CEO, and sole shareholder. Its business address is at 552 West Boylston Street in Worcester. In 2007, it employed about twenty people, the majority of whom were phlebotomists. CPS stationed one of its phlebotomists in the same office suite as Haas. Haas and other physicians in his building utilized CPS to perform blood draws.
CPS is a separate and distinct business from Haas’s medical practice although it did not display a sign or any other identification at Haas’s building. CPS, not Haas, was responsible for hiring and firing its phlebotomists. Haas did not train any of CPS’s phlebotomists. He never employed a phlebotomist in his office, beyond this arrangement with CPS.
In 2007, CPS employed a phlebotomist named Ditela Dhima (“Dhima”). It paid her an hourly wage.
On November 14, 2007, McRell visited Haas in connection with treatment for diabetes. Haas ordered a routine blood draw. Haas states that when he orders a blood draw, he gives the patient a choice between going to a laboratory of their choosing or having blood drawn at his office. McRell responds that Haas refers patients directly to labs for blood draws between patient visits. She contends that his usual practice is to have CPS technicians draw patients’ blood in his office *76 during the examination, in the same treatment room where the patient saw Haas.
Dhima performed McRell’s blood draw in Haas’s examination room. McRell alleges that Dhima attempted to draw blood improperly and struck a nerve in McRell’s left arm. This caused severe pain and lingering numbness and discomfort. McRell was told to see a neurologist at UMass Memorial Medical Center.
Haas was not present at the blood draw and has no memory of any conversation with Dhima regarding the blood draw. Haas states that he did not supervise the phlebotomists and that supervision was entirely the responsibility of CPS. He further avers that he did not direct Dhima as to how to draw blood. McRell responds that CPS expected its phlebotomists to follow the instructions of the physician who ordered the blood draw. In his deposition, Byrne stated that a physician might warn a phlebotomist that a patient was hesitant about the blood draw, or might provide information about a condition, such as a mastectomy, that the phlebotomist should be aware of before performing the procedure. McRell also notes that Haas admitted that if he saw a phlebotomist drawing blood incorrectly, he would express his concern to the phlebotomist. McRell states that Haas had addressed concerns with CPS phlebotomists in the past regarding issues such as availability and timeliness.
Haas did not regularly inform his patients that the phlebotomists at his office were not his employees. Haas said nothing to McRell about any employment relationship between himself and the phlebotomist. McRell did not ask Haas who employed Dhima or any of the other phlebotomists who performed her blood draws. McRell assumed the phlebotomist was Haas’s employee because she drew blood in his office suite. McRell states that CPS phlebotomists would wear lab coats or scrubs, with nothing to identify them as CPS employees. She avers that CPS only performed blood draws at the request of physicians that it had a relationship with, such as Haas. She further contends that CPS expected Haas to communicate any instructions or concerns directly to the phlebotomists.
Discussion
A. Count III: Batteiy: Issue of Consent
McRell alleges that Dhima committed battery against her when she performed the blood draw. To maintain an action for a battery, McRell bears the burden of proving that Dhima intended to bring about a harmful or offensive contact with McRell’s body, and that the harmful or offensive contact did occur. Waters v. Blackshear, 412 Mass. 589, 590 (1992). However, if McRell consented to this contact, her consent would bar her claim. Matter of Spring, 380 Mass. 629, 638 (1980). Consent in a claim of batteiy differs from that in a breach of informed consent. Erikson v. Garber, 2003 Mass.App.Div. 125, 126 (2003). While the issue in a breach of informed consent is whether the physician disclosed all material medical information to the patient to allow for an informed decision, the question in an action for batteiy is merely whether the patient consented to the contact in question. Id.
In the present case, McRell does not contest the fact that she consented to Dhima performing the blood draw. Although she contends that she only consented because she believed Dhima to be Haas’s employee, her reasons for consenting are not relevant to a batteiy claim. Id. The question of whether Haas failed to provide her with sufficient information, or whether her consent was inadequate, would only apply to a breach of informed consent. Id. McRell cannot maintain a batteiy claim when she consented to the touching in question. As a result, Haas is entitled to summary judgment on Count IV of McRell’s First Amended Complaint.
B. Count IV: Vicarious Liability; Issue of Agency
McRell also contends that Dhima was negligent in performing the blood draw. She argues that Haas must be held vicariously liable for Dhima’s conduct because Dhima was his agent. An agency relationship exists “when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal’s control.” Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000), and cases cited.
“The right to control an agent’s activities has been the guiding principle in deciding cases involving an assertion of vicarious liability against the agent’s principal.” Kelley v. Rossi, 395 Mass. 659, 661 (1985). Clearly, Haas took a number of steps in order to avoid the creation of an agency relationship between himself and Dhima. Haas lacked the power to hire or fire Dhima. He did not employ her himself, and he did not pay her any wages, at least directly, for working out of his office suite. He did not set the terms of her employment even though he informed CPS of his requirements. He had no involvement in her training as a phlebotomist. He did not provide direct supervision of her work, and was, in fact, in another room when Dhima allegedly injured McRell. He apparently gave no directions to Dhima as to how to draw blood from McRell.
However, despite Haas’s precaution's, several facts still suggest that Dhima may have been his agent. Haas and the other doctors in his medical suite had a CPS technician at the lab station in the office during normal business hours. In addition, Byrne’s deposition indicates that Haas had some ability to control Dhima’s medical decisions. If Haas was concerned that a patient was hesitant to have blood drawn, or if he believed that a patient’s medical condition should dictate the manner in which Dhima drew blood, he would provide her with instructions. CPS expected its phlebotomists to follow these instructions. Haas also stated that he would inform a phlebotomist if she was drawing blood incorrectly (not surprisingly, since it *77 would appear disingenuous for any doctor to claim to stand by idly if he knew that a person in the position of Dhima was negligently performing her duties). In the past, Haas had voiced concerns to CPS phlebotomists regarding their availability and timeliness. As a result, genuine issues of material fact exist as to whether Haas possessed sufficient control over Dhima’s professional activities to create a principal-agent relationship. See Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317, 323 (2002) (amedical corporation could not escape vicarious liability as a matter of law simply because it could not exert direction and control over a doctor’s clinical decisions).
Moreover, even if Dhima did not possess actual authority to act as Haas’s agent, McRell has a basis to argue that Haas can be held liable for her actions on a theory of apparent authority. Apparent authority exists when a principal engages in conduct which causes a third party reasonably to believe that a particular person has authority to act as the principal’s agent. Hudson v. Massachusetts Property Ins. Underwriting Ass’n, 386 Mass. 450, 457 (1982). “If a third person goes on to change [her] position in reliance on this reasonable belief, the principal is estopped from denying that the agency is authorized.” Id. McRell contends that, based on Haas’s conduct, she believed Dhima to be acting as his agent, relied upon this belief to allow her to draw blood, and suffered harm as a result.
First, Haas’s actions could have caused McRell to reasonably believe that Dhima was his agent. A patient in McRell’s position could find it reasonable to think that a phlebotomist operating out of the same office suite as her doctor, works for that doctor. Haas sent McRell to Dhima to draw blood during McRell’s appointment with him. He allowed Dhima to perform the procedure in his examination room. There is no evidence that Dhima wore or displayed anything that identified her as a CPS employee. Haas never informed McRell that Dhima worked for CPS rather than for him. Cf. Chase, 31 Mass.App.Ct. at 667 (a statement in the plaintiffs membership agreement suggesting that there was not a principal-agent relationship between two parties weighed against a finding of apparent authority). A trier of fact may thus find it reasonable for McRell to have assumed that Dhima served as Haas’s agent.
Next, a reasonable jury could also determine that McRell relied upon her assumption that Dhima was Haas’s agent when she allowed Dhima to draw her blood. Haas was McRell’s doctor, and she appears to have permitted Dhima to perform the procedure based upon her belief that Haas had hired or trained Dhima. She may have been more accepting of Dhima, rather than another phlebotomist, based upon what she perceived as Dhima’s relationship with Haas. There thus exists a genuine issue of material fact as to whether Dhima possessed apparent authority to act as Haas’s agent. Accordingly, Haas is not entitled to summary judgment on Count III.
Order
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion for summary judgment is ALLOWED as to Count IV and DENIED as to Count III.