van Gestel, J.
This matter comes before the Court after a jury-waived trial on the merits of the individual claim of the plaintiff, and class representative, Kelli K. Goodrow (“Goodrow”).[1] There follows the Court’s findings of fact, rulings of law and an order for judgment on the claim tried.
FINDINGS OF FACT
The defendant, Lane Bryant, Inc. (“Lane Bryant”) operates a nationwide (in 40 to 42 states) chain of retail stores selling specialty clothing and related goods catering to larger-sized women. At all relevant times there were 850 to 900 stores in the chain. There was wide variety in the size and location of the individual stores — ranging from 1,500 to 35,000 square feet of floor sales space, and located in malls as well as free standing facilities. Individual stores’ sales volumes might vaiy from as little as $300,000 per year to as much as 2 to 3 million dollars per year. Several Lane Bryant stores are sited in Massachusetts.
*702 On November 9, 1993, Kelli Goodrow (then known as Kelli K. Kachadoorian) began work at the Lane Bryant store located in the Greendale Mall in Worcester, Massachusetts. Goodrow started at a weekly salary of $320. After a brief period of training Goodrow was transferred to the Lane Bryant store in Auburn, Massachusetts, where she remained until leaving the company’s employ, voluntarily, on April 10, 1995.
On March 6, 1994, Goodrow’s pay was raised to $325 per week. On March 12, 1995, she received another raise to $342 per week.
Goodrow’s job title was a “co-sales manager.” At the Auburn store where Goodrow worked there were three categories of employees: a store sales manager, co-sales managers and sales associates. The store sales manager and the co-sales managers were paid on a weekly salary basis. The sales associates, who were generally part-time workers, were paid on an hourly basis. The co-sales managers — and perhaps the store sales manager, although there was no evidence on the point — during Goodrow’s time of employment received additional compensation for hours worked in excess of 40 hours per week. It is that latter “overtime” compensation that forms the basis for this case.
Although there were more employees assigned to the Auburn store, on an average day, except during the Christmas holiday season, there were usually only two or sometimes three employees present at any one time. Those employees would constitute the store sales manager, one co-sales manager and a sales associate. The store was opened for customers generally from 10:00 a.m. to 9:00 p.m. The employees would have staggered hours to cover the period from preopening preparations starting at 9:30 a.m. until closing was completed at about 9:30 p.m. During the Christmas holiday season — from Thanksgiving until New Year’s — additional hours were worked and additional employees were often on duty.
On an average (non-holidays) week Goodrow would work 46 to 47 hours. During the holiday season an additional five to seven hours were added. Goodrow never worked fewer than 40 hours per week.
Although there was some hierarchy at the store level — the store sales manager was at the top, next came the co-sales managers and finally the sales associates — for the most part the work was pretty much a shared experience, with emphasis on retail sales. Goodrow described her average day’s duties as follows: she would arrive at about 9:30 a.m., at which time she would enter the store, turn on the cash registers, put cash in the registers, and examine what was called “register mail": next she would do whatever may have been needed to set up promotions; at 10:00 a.m. the store would be open to customers, and for the rest of the day she, along with all of the other employees, would involve themselves in the retail sales efforts, including waiting on and assisting customers, ringing up sales on the cash registers, replacing sold items on shelves, racks or hangers, and generally keeping the store neat and presentable for the sales effort; often at about 12:30 p.m. the part-time sales associate would go home, and another co-sales manager would arrive and stay until closing, while Goodrow would remain until about 6:30 p.m. If Goodrow was the co-sales manager scheduled to arrive at 12:30 p.m., instead of 9:30 a.m., then she would stay until the store closing process was completed at about 9:30 p.m. The closing process included cleaning up the premises, vacuuming the floor if needed, fixing light bulbs, washing mirrors, dusting, closing the cash registers, putting away the day’s receipts, making bank deposits and locking the store for the night.
At the final closing of the store each night, by company rule, each employee, as she left, had her pocketbook and bags checked by a fellow employee to insure that she was not misappropriating merchandise.
Some of the other duties expected of co-sales managers included cleaning bathrooms, putting out rubbish, assisting and providing on-the-job guidance to sales associates and setting up “P-Packs.” A P-Pack was a periodically distributed directive from company headquarters in Ohio, sent nationwide, to intiate special sales efforts. The P-Pack would, in a generic sort of way, describe the product or products to be featured and dictate the general store set up for the display. Each store, however, was different in size, design, age, location and other factors, such that there was a degree of individual judgment that had to be brought to bear in setting up a P-Pack. Co-sales managers, like Goodrow, participated fully in the P-Pack assembly, right down to the physical work of relocating shelves, racks and merchandise tables, hanging signage and putting out the items on display.
Co-sales managers did not have authority to hire, fire or discipline other employees. In fact, at least in the Auburn store, even the store sales manager had limited authority in this regard. There was a layer of management above that in the local stores, consisting of: an executive vice-president and a director of human resources, both based at the home office in Ohio; regional sales managers that covered geographic areas of the country such as, in the case of Auburn, Massachusetts, a Northeast regional manager who was responsible for 87 stores; and district sales managers that are under the regional sales managers, covering smaller areas. The Northeast regional manager, for example, has an average of eight district managers in his region.
Personnel management issues are handled very much on a group basis, called “partnering” by management employees, whereby decisions to hire or fire are for the most part dealt with at a level above that of the individual store.
During the time that Goodrow was working in the Auburn store, there were two changes in the store *703 sales manager position. On those occasions, Goodrow, being the senior[2] in terms of experience among the co-sales managers, would assume some of the responsibilities of the store sales manager. That assumption was, however, unofficial and resulted in no increase in compensation. Also, during those times the district manager — Barbara Budlong, in these instances— would make much more frequent visits to the Auburn store, particularly when P-Packs were being set up. These visits by Budlong, when there was an absence of a store sales manager, would occur as much as three or four times a week.
Lane Bryant expected all of its co-sales managers to meet certain “sales goals.” For Goodrow, those goals were set forth in her personnel file. They included making at least three sales per hour worked, in which she averaged at least four items per sale, which would generate at least $60.00 per sale, with average sales of $125.00 per hour worked. Goodrow was also directed to solicit customers to apply for a Lane Bryant credit card, and was expected to enlist at least one new credit card customer during each 8 hours worked.
Prior to the time of Goodrow’s employment by Lane Bryant, co-sales managers were paid on a fluctuating workweek basis that included both a salary and some overtime compensation. Then, in 1991, they were shifted to straight salary, with no overtime. This change produced complaints to the U.S. Department of Labor (“DOL”), which initiated an investigation of Lane Bryant’s overtime payment practices to determine if there was compliance with the federal Fair Labor Standards Act (“FLSA”). In November of 1992, a year before Goodrow joined Lane Bryant, the company reached an accord with the DOL on the overtime issue. Under the terms of the settlement, Lane Bryant agreed, beginning November 15, 1992, to “pay [its] co-sales managers on a fluctuating workweek basis.” The company stated “in order to avoid weekly computations and to provide additional compensation, co-managers, in accordance with FOH Sec. 32b04b(a), will receive an extra half-time based on their salary divided by forty hours.”
Although there is some doubt as to whether the details of the pay arrangement were explained to Goodrow at the time of her hire in November 1993, at least by March 15, 1995 when she was being paid a salary of $325.60 per week, she was generally aware of how her compensation was calculated. It was on that latter date that Goodrow signed a memorandum (Exhibit 2) explaining the compensation scheme as it applied to her. In pertinent part, the memorandum read:
As a Co-Sales Managers [sic] (“CSM’j of Lane Bryant, you are an Exempt, Salaried associate. This means that you will be paid a weekly salary for hours worked each week. For all hours worked in excess of 40 per week, you will receive a supplemental rate of pay equal to one-half (.5) your regular rate of pay.
The memorandum included the following example:
Example (Based on Your Personal
45-hour workweek): Calculation:
Base Weekly Salary:
$308.00/week $325.60/week
Supplemental Rate:
$3.85/hour $4.07/hour
($308/40x .5)
$308 x 52 wks= $325.60x52 =
$16,016.00 $16,931.20
$3.85 x 52 wks x 5= $4.07 x 52x 5 =
$1,001.00 $ 1,058.20
Annual Target Salary
$17,017.00 $17,989.40
Despite receiving and signing the memorandum on March 15,1995, Goodrow testified on March 18, 1999, that she did not realize until the prior day that the effect of the compensation plan of Lane Bryant was to pay her less per hour of overtime the greater number of hours she worked.
Based on the forgoing method of calculation, during the time that Goodrow was working at Lane Bryant and earning a salary of $320 per week, her overtime hourly rate was $4 per hour; $325.60 per week, overtime rate $4.07 per hour; and $342 per week, overtime rate $4.275 per hour.
When Lane Bryant changed its compensation method for co-sales managers in November of 1992, it did so after receiving and relying on the advice of outside counsel experienced in labor relations, particularly wage and hour matters. The attorney consulted had extensive involvement at the Department of Labor, as well as in private practice thereafter. He advised Lane Bryant that the fluctuating workweek method of compensation for overtime for nonexempt employees, calculated in the manner ultimately adopted by Lane Bryant, was acceptable in all states with the exception of Alaska and California, and in the Commonwealth of Puerto Rico. Specifically, this expert advised that the method would be in compliance with Massachusetts law.
Lane Bryant pays its co-sales managers in California on an hourly basis — at an hourly rate that ensured that they would receive approximately the same gross amount of compensation for a 45-hour week for a co-sales manager in Massachusetts — plus time and one-half for each hour over 40 worked in any one week. The California co-sales managers have the same duties as co-sales managers in Massachusetts.
RULINGS OF LAW
This case involves the interpretation and application of G.L.c. 151, Sec. 1A to the facts found.[3] G.L.c. 151, Sec. 1A requires an employer to pay its nonexempt employees overtime compensation at a rate not less than one and one-half times their regular rate of *704 pay for all hours they work in excess of 40 in any given week. The statute reads in material part
... no employer in the commonwealth shall employ any of his employees in an occupation, as defined in Section two, for a work week longer than forty hours, unless such employee receives compensation for his employment in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed.
Having been added to the General Laws in 1960 by St. 1960, c. 813, one would have expected that by now, 39 years later, there would be a plethora of appellate decisions ironing out any wrinkles in the legislative wording. Not so. Indeed, there do not appear to be any decisions addressing the issues here under consideration. This Court must, therefore, look first to the statutory language and any legislative history that would shed light on the legislative intent. Courts “must construe statutes as written ... In construing a legislative enactment, it is our duly to ascertain and implement the intent of the Legislature.” Pielech v. Massasoit Greyhound, Inc., 423 Mass. 534, 539 (1996). “Statutory language is the principal source of insight into [(legislative purpose.” Commonwealth v. Lightfoot, 391 Mass. 718, 720 (1984).
Also, it is not improper to consider — even if not being bound by — the expressed views of courts and agencies outside of Massachusetts, federal and state, that have dealt with similar statutes or issues. See, e.g., Rudow v. Commissioner of the Division of Medical Assistance, 429 Mass. 218, 227-228 (1999); Howard v. Burlington, 399 Mass. 585, 589 (1987); Vasys v. M.D.C., 387 Mass. 51, 54 (1982). One such statute, which Lane Bryant urges warrants careful consideration, is the federal Fair Labor Standards Act. The FLSA reads in material part, at 29 U.S.C Sec. 207(a)(1),
... no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.
The FLSA was first adopted in 1938. Perhaps that explains why it, unlike the Massachusetts statute, has had the “benefit” of judicial review and interpretation. Lane Bryant urges this Court to be guided by the rulings on the FLSA that deal with the issues similar to those here in dispute, pointing particularly to the fact that it — and many, many other employers — has followed those decisions in good faith when interpreting Massachusetts law.
The Test for Exemption
The first legal issue to be resolved is what test should be applied to determine whether Goodrow is entitled to the benefits of G.L.c. 151, Sec. 1A. The statute, by Sec. 1A(3), is not applicable to “a bona fide executive, or administrative or professional person or qualified trainee for such position earning more than eighty dollars per week.”
It is Lane Bryant’s burden to prove that an employee asserting a claim for unpaid overtime compensation is exempt from the requirements of Massachusetts law. See, e.g., Sarni Original Dry Cleaners, Inc. v. Cooke, 388 Mass. 611, 617-18 (1983).
Neither the statute itself, nor any Massachusetts regulations, provides instructions as to how to make this determination. There are, however, “guidelines” that were first promulgated by the Massachusetts Department of Labor and Industries in 1965, and republished in 1989. See A Judicial Guide to Labor and Employment Law, Flaschner Judicial Institute — 1990, pp. 236-37. These guidelines, however, are not the law, nor are they binding on the Court.
It is the view of this Court that the meaning of the phrase “bona fide executive” left, as it is, undefined by the Legislature, cannot be set forth with specificity but rather must be determined and permitted to evolve on a case-by-case, decision-by-decision basis in the true application of the common law. Thus, neither the “guidelines” referred to above, nor the long or short tests included in the federal regulations adopted pursuant to and in aid of the FLSA, 29 C.F.R. Sec. 541.1, can be said to be the law in Massachusetts.
This Court, in making these rulings, will have in mind and apply common dictionary definitions of the appropriate words, as well as those items included in the Massachusetts “guidelines” and the long test in the federal regulations. The Court will examine the evidence with a focus more on what Goodrow actually did rather than what her job description suggested that her primary duties might be. In short, it will be deeds, and not words, that control.
Before beginning its evidentiary review, however, the Court looks first at the undefined phrase “bona fide executive” as used in c. 151, Sec. 1A(3), the exemptions portion of the act.
No definitions of the phrase “bona fide executive” by the Supreme Judicial Court or the Appeals Court have been uncovered. In interpreting the FLSA exemption, Judge Ford, of the U.S. District Court for Massachusetts, once ruled that an employee who spent more than 20% of his time performing tasks “of the same nature as [those] performed by nonexempt employees” was not employed in a “bona fide executive” capacity. Sawyer v. Selig Mfg. Co., 74 F.Supp. 319, 322 (D.Mass. 1947).
An “executive” is defined in Webster’s Third New International Dictionary as “one who holds a position *705 of administrative or managerial responsibility in a business or other organization.”
“Bona fide” is said by Black’s Law Dictionary (6th ed.) to mean, among other things, “truly; actually; without simulation or pretense .. . real, actual, genuine, and not feigned.” Webster’s uses the words “not specious or counterfeit: genuine,” and suggests as a synonym “authentic.” Similar words are used in Roget’s Thesaurus; “genuine, authentic, legitimate, real.”
To this Court, the phrase “bona fide executive” must have been intended to mean a real boss, not just someone in name or title only. Given the description of what the co-sales managers did in the Auburn, Massachusetts Lane Bryant store, they can hardly be said to be bona fide executives. Indeed, it seems questionable whether even the store sales manager in the two- to three-person Lane Bryant store in Auburn was really a boss, given the close supervision of the district manager and the regional manager in the company hierarchy.
Cleaning the toilets and putting out the rubbish are hardly the tasks companies assign to their executives. Nor is a compensation rate of less than $18,000 per year what one would expect for an executive employee. Vacuuming the floor, ringing up sales at a cash register, stocking shelves, hanging signs, opening boxes of merchandise and putting products out for sale similarly do not seem the fare of someone who is genuinely a boss. The co-sales managers, tellingly, don’t even have that basic of all executive powers: the obligation, right or duty to hire and fire workers.
On average, Goodrow spent most of her workday engaged in tasks wholly unrelated to management. For the most part, her duties related to selling, preparing for the selling effort and cleaning up after the job was done.
Despite what Lane Bryant called Kelli Goodrow in its 1995 compensation memorandum, it failed to prove that she was at any time — even when filling in for an absent store sales manager — exempt from the overtime requirements of G.L.c. 151, Sec. 1A.
Calculation of Overtime Compensation
At first reading, G.L.c. 151, Sec. 1A would seem to direct, in a straightforward way, how overtime compensation ought to be calculated. It speaks, in plain language, of “compensation for ... in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed.” The statute leads into those words with the mandate that “no employer in the commonwealth shall employ any of his employees for a workweek longer than forty hours, ...” Absent the gloss of certain Massachusetts regulations and interpretation given by other courts, including the United States Supreme Court, to seemingly similar language in the FLSA, this Court would have had no trouble ruling that whatever a nonexempt salaried employee’s weekly rate of pay was, her overtime should be calculated by simply dividing the weekly rate by 40, to convert it to an hourly rate, and then multiplying the resulting hourly rate by 1.5 to determine the overtime amount due for each hour in excess of 40. The United States Supreme Court,[4] and other courts, as well as the drafters of Massachusetts regulations, however, have made this simple task less facile.
The crux of the contention comes from attempts to interpret the words “regular rate” as used in G.L.c. 151, Sec. 1A in a situation in which a salaried employee, such as the co-sales managers at Lane Bryant, works a fluctuating week that does not coincide precisely with 40 hours — sometimes less, but in Goodrow’s case always more. The concept of the “fluctuating workweek” has been a factor in calculating overtime benefits since the adoption of the FLSA in 1938. Lane Bryant began reusing it in November 1992, and urges that this Court should consider it to be part of the law of Massachusetts.
The fluctuating workweek method of calculating an employee’s regular rate of pay is a process by which the employee’s salary is divided by the number of hours the employee worked in any given week to produce an hourly rate. The hourly rate so calculated is then multiplied by 1.5 to determine the time and one-half amount to be paid for each hour in excess of 40 worked in the week in issue.
In an opinion issued in 1942, the Supreme Court described the foregoing method of calculating the “regular rate” under the FLSA. See Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 580 (1942). At note 16, on page 580, the Supreme Court said: “Wage divided by hours equals regular rate. Time and a half regular rate for hours employed beyond statutory maximum equals compensation for overtime hours.” This method of calculation was not the central issue in this case, the real issue being a frontal challenge to the constitutionality of the FLSA itself; nevertheless, it has been cited by lower courts and employers in support of the method ever since.[5] See, e.g., Fakouri v. Pizza Hut of America, Inc., 824 F.2d 470, 473-74 (6th Cir. 1987). Aside from providing historical background, Overnight Motor is only marginally interesting as a reminder of times gone by; as a guide to what was in the mind of the Massachusetts General Court when it enacted c. 151, Sec. 1A in 1960, it is not at all enlightening to this Court.
Of some additional interest are the regulations included in 455 C.M.R. 2.00, et seq. Those regulations, however, have an unexplained, and confusing, history. For the period from September 1, 1993 through October 2, 1997, 455 C.M.R. 2.02 dealt with the phrase “regular hourly wage rate.” Thereafter, the same regulations began using the phrase “regular hourly rate.” The reason, or significance, for the difference is unexplained and remains in the mists. Each side here has *706 seized upon the regulatory language as support for diametrically opposing positions.
This Court, having in mind that the General Court must have intended some salutary, rather than punitive, benefit to employees by creating the overtime requirements in c. 151, Sec. 1A, tested the results of the method of calculation used in Overnight Motor on hypothetical situations. The results demonstrate losses to employees and benefits to employers.[6]
Assuming, for example, that an employee is paid a weekly salary of $250.00 as straight time compensation but works varying numbers of hours each week, the following is not an improbable scenario, applying the Overnight Motor “fluctuating workweek” method of overtime calculation:
Week 1
Hours worked 40 (no overtime)
Regular Rate $250/40 = $6.25/hour
Overtime Rate $6.25 x 1.5 $9,375
Straight Time Pay $6.25 x 40 $250
Overtime Pay None
Total Pay $250.00
Week 2
Hours worked 44 (4 overtime hours)
Regular Rate $250/44 = $5.682/hour
Overtime Rate $5,682 x 1.5 $8,523
Straight Time Pay $5,682 x 40 $227.28
Overtime Pay $8,523 x4 = $34.09
Total Pay $261.37
Week 3
Hours worked 50 (10 overtime hours)
Regular Rate $250/50 = $5.00/hour
Overtime Rate $5.00 x 1.5 $7.50
Straight Time Pay $5.00 x 40 $200.00
Overtime Pay $7.50 x 10 $75.00
Total Pay $275.00
Week 4
Hours worked 60 (20 overtime hours)
Regular Rate $250/60 = $4.167/hour
Overtime Rate $4,167 x 1.5 $6,251
Straight Time Pay $4,167x40 $166.68
Overtime Pay $6,251 x 20 $125.02
Total Pay $291.70
As is readily seen from the foregoing, using the particular method of calculation approved in Overnight Motor, the more hours over 40 per week that the employee works, the lower her hourly rate becomes and the lower her overtime rate per hour becomes. The Supreme Court concedes this fact. Overnight Motor, supra at 580. Further, if permitted to happen — as it did in weeks 3 and 4 here — the hourly rate could fall below the Massachusetts minimum wage. Nothing in this scenario is beneficial to the employee, nor can it readily be seen how it would encourage employers to limit, rather than expand, overtime hours.
Statutes, like the FLSA and G.L.c. 151, Sec. 1A, are “aimed at hours as well as wages.” Overnight Motor, supra, at 576.
Real-life applications, not theoretical maunderings, must dictate this Court’s conclusions on the joint issues of how overtime should be calculated and whether the fluctuating workweek method should be engrafted onto G.L.c. 151, Sec. 1A. The “regular rate,” as that phrase is used in the Massachusetts statute, should be calculated by dividing the weekly salary by 40. Interestingly, this is precisely what Lane Bryant does in its version of the fluctuating workweek calculation it began in 1992.[7] The overtime rate, however, should be 1.5 times the resulting calculation, not .5 times that amount as is employed by Lane Biyant.
The Massachusetts statute calls for a 40-hour workweek and imposes a time and one half pay requirement for each hour worked in excess of 40. It would be far too easy and to this Court, could not have been intended by the Legislature to avoid the requirement by causing people to work longer than 40 hours and using the longer hour denominator to reduce the “regular” rate. A similar avoidance of the statutory mandate comes in applying Lane Bryant’s method of using 40 hours to determine the “regular” rate, but only paying an additional one half time for each overtime hour worked.
As noted in the findings above with regard to Lane Bryant’s California co-sales managers, the company does not treat them as exempt executives, nor does it have any apparent difficulty in calculating their overtime compensation in a manner similar — but for their hourly wage status — to that directed by the Court here. Nor is it insignificant that Lane Bryant concedes that its California co-sales managers have the same duties as those with identical titles in Massachusetts.
Lane Bryant’s method of calculating overtime for Kelli Goodrow had a particularly unfortunate result for her. By dividing her salary by 40 to determine the regular hourly rate and then paying her only .5 times that amount as overtime compensation, she made less than she would under the Overnight Motor method, and even still less than applying the method ruled appropriate by the Court here. For example, when Goodrow was making a salary of $320 per week, Lane Bryant’s calculations would give her $360 for a 50-hour week [$320/40 = 8 x .5 = $4; $320 + (4 x 10) = $360]. The Overnight Motor calculation for the same week would produce $416 ($320/50 = 6.4x 1.5 = $9.6; $320 + (9.6 x 10) = $416]. And the Court’s method produces the most for her — $440; ($320/40 = 8 x 1.5 = $12; $320 + (12 x 10) = $440].
To the extent this Court’s application of the Massachusetts law varies from what is called the “fluctuating workweek method,” the latter cannot be incorporated as part of the Massachusetts statute, absent, of course, more specific direction by the General Court.
Should this Court ultimately be found to have incorrectly assessed the application of the fluctuating workweek method of calculating overtime pay to c. 151, the Court nevertheless is of the view, and so rules, *707 that the process may only be applied to a nonexempt employee in the context of an express and provable clear mutual understanding between the employer and the employee that demonstrates that the employee fully comprehends the method of overtime wage calculation to be utilized and any effect of diminishing returns the longer the employee works. See, e.g., Griffin v. Wake County, 142 F.3d 712, 715-16 (4th Cir. 1998); Bailey v. Co. of Georgetown, 94 F.3d 152, 155-56 (4th Cir. 1996).
The information that Lane Biyant provided to Goodrow regarding the method of her compensation was ambiguous, contradictory and incomplete. She was told that her starting salary of $320 per week represented a payment of “$8.00 per hour” for 40 hours, and that she would be paid an additional $4.00 per hour for hours that she worked over 40 in one week. She was not, however, told that her salary of $320 per week was compensation for all of the hours she worked in a week and that she would, therefore, only be paid an additional .5 times her hourly rate for each overtime hour worked.
Given the Court’s ruling on the method of calculating Kelli Goodrow’s overtime, as applied to the overtime hours she worked at the different rates noted in the foregoing findings, she is entitled to an additional $3,773.58,[8] plus appropriate interest.
Multiple Damages
Citing G.L.c. 151, Sec. IB, the plaintiff argues that since Lane Bryant violated c. 151, Sec. 1A, she is entitled to multiple damages. Given the uncertainty of the state of the law in Massachusetts and the fact that Lane Bryant relied on the advice of counsel and has followed law and procedures apparently sanctioned elsewhere, there is no legal or equitable basis on which to impose a penalty on it in this case.
In material part, Sec. IB provides that “if any person is paid by an employer less than such overtime rate of compensation, such person may recover in a civil action three times the full amount of such overtime rate of compensation less any amount actually paid to . . . her by the employer, together with costs and such reasonable attorneys fees as may be allowed by the court, ...” (Emphasis added.) This Court reads that language — particularly the word “may" — as providing it discretion in the imposition of any “penalty” for a violation of the statute. Thus, in the exercise of that discretion, the Court, for the reasons noted immediately above, declines to treble the amount of the award to the plaintiff. It does, however, rule that an award of reasonable attorneys fees and costs is appropriate.
ORDER FOR JUDGMENT
Judgment shall enter in favor of the plaintiff, Kelli K. Goodrow, awarding her damages against the defendant, Lane Bryant, Inc., in the amount of $3,773.58, plus interest thereon and costs and reasonable attorneys fees, the latter to be hereafter determined.

 By Order dated March 11, 1999, this Court severed and stayed all proceedings on the class action aspects of this case pending the resolution and appeal of the individual claim. This was because there are certain legal issues of first impression in Massachusetts that are raised in the individual claim and will also apply to the class claims that ought to be fully resolved before trial of the class claims begins. Indeed, resolution of some of those issues may have an effect upon whether it is appropriate even to proceed in a class action format.

 “Senior” is a relative term. Goodrow only was employed at Lane Bryant for a total of 17 months.

 On March 1, 1999, this Court, responding to pre-trial motions and conferences with counsel, issued a Memorandum and Rulings on Certain Legal Issues. At that time it was anticipated that this case would be tried to a jury. Properly, the parties sought guidance from the Court on certain legal issues of first impression in Massachusetts in aid of the preparation for and trial of the case to a jury. Since then the jury trial has been waived — only so far as this individual claim is concerned. Consequently, the Court now has an opportunity, having heard the evidence and found the facts, to consider once again its legal conclusions and to fill in some of the gaps left in the absence of a factual record.

 Intending no disrespect to the Supreme Court, this Court observes that what is being interpreted here is a state statute, in an area of law not determined to be preempted by federal law, see Cosme Nieves v. Deshler, 786 F.2d 445, 452 (1st Cir. 1986), and not here infected with U.S. constitutional principles. Consequently, this Court’s guidance and direction must come, ultimately, from the Supreme Judicial Court of Massachusetts. See, e.g., Hillis v. Lake, 421 Mass. 537, 545-46 (1995).

 It is interesting, and perhaps helpful, to note the historical context in which the Overnight Motor case was litigated, as reported by the Supreme Court. The country, at the time the FLSA was adopted, and when that case was first filed, was still in the throes of the Great Depression. Unemployment was massive and devastating to the nation’s economy and economic well-being. The president, in advocating for the portion of the law establishing the 40-hour work week, was seeking to find a way to provide more work for more people by cutting the number of hours the average worker was employed so that others could work as well. One option, of course, was simply to prohibit any work for longer than 40 hours in a week. Instead, the president pushed the economic prod of mandating time-and-one-half pay — this at a time when businesses as well as workers were economically depressed — as a means of coercing employers to provide more workers an opportunity to be employed. It was felt that rather than pay time and one half, employers would keep employees’ workweeks close to 40 hours and thereby employ more workers.

 The Court is not unaware that these theories have been utilized by other courts in other jurisdictions. Nor, however, can it be said that their application would come closer to achieving the Supreme Court’s stated purpose behind the FLSA of creating more jobs, since the resulting calculations seem to benefit the employer who keeps the same person working longer rather than encouraging that employer to hire additional workers to avoid the burden of paying overtime wages.

 Lane Bryant’s fluctuating workweek calculation is not the same as that approved in Overnight Motor and the decisions that have followed in its wake.

 The parties have stipulated to this amount.